ORIGINAL

1 | **WEILAND, GOLDEN,**
**SMILEY, WANG EKVALL & STROK, LLP**
2 | Evan D. Smiley, State Bar No. 161812
Philip E. Strok, State Bar No. 169296
3 | Hutchison B. Meltzer, State Bar No. 217166
650 Town Center Drive, Suite 950
4 | Costa Mesa, California 92626
Telephone: (714) 966-1000
5 | Facsimile:   (714) 966-1002

6 | General Insolvency Counsel for Debtor and
Debtor-in-Possession
7 |

```
                    FILED

                  JAN - 9 2007

         CLERK U.S. BANKRUPTCY COURT
         CENTRAL DISTRICT OF CALIFORNIA
         BY                    Deputy Clerk
```

8 | ## UNITED STATES BANKRUPTCY COURT

9 | ## CENTRAL DISTRICT OF CALIFORNIA

10 | ## SANTA ANA DIVISION

| | |
|---|---|
| 11  In re | Case No. SA 06-11444 ES |
| 12  SPECTRUM RESTAURANT GROUP, INC., a Delaware corporation; | Chapter 11 Case |
| 13  GRANDY'S, INC., a California corporation; SPOONS RESTAURANTS, | |
| 14  INC., a Texas corporation; SPECTRUM FOODS, INC., a California corporation; | **NOTICE OF MOTION AND DEBTOR'S MOTION FOR ORDER AUTHORIZING AND APPROVING:** |
| 15  CRABBY BOB'S FRANCHISE CORP., a California corporation; LOCAL | |
| 16  FAVORITE, INC., a California corporation; Substantively consolidated | **(1) SALE OF CERTAIN OF DEBTOR'S ASSETS ("GRANDY'S") FREE AND CLEAR OF LIENS, CLAIMS, AND** |
| 17  reorganized debtors under Case No. SA 03-15911 ES, | **INTERESTS PURSUANT TO 11 U.S.C. §§ 363(b) AND (f); AND** |
| 18  | |
| 19  | **(2) ASSUMPTION AND ASSIGNMENT OF RELATED UNEXPIRED LEASES AND EXECUTORY CONTRACTS;** |
| 20  | |
| 21  | **MEMORANDUM OF POINTS AND AUTHORITIES; DECLARATIONS OF** |
| 22  Debtor and Debtor-in-Possession. | **KENNETH MUCHA AND ALEXANDER W. STEVENSON IN SUPPORT** |
| 23  | **HEARING:** |
| 24  | **DATE:   February 1, 2007**
**TIME:    2:30 p.m.** |
| 25  | **CTRM:   5D** |

26

27

28

**TO THE HONORABLE ERITHE A. SMITH, UNITED STATES BANKRUPTCY JUDGE, THE OFFICE OF THE UNITED STATES TRUSTEE, SECURED CREDITORS, COUNSEL FOR THE OFFICIAL COMMITTEE OF CREDITORS HOLDING UNSECURED CLAIMS, LANDLORDS, INTERESTED TAXING AUTHORITIES, ALL PARTIES REQUESTING SPECIAL NOTICE, AND OTHER INTERESTED PARTIES:**

**PLEASE TAKE NOTICE** that on **February 1, 2007 at 2:30 p.m.**, the Court will hear the motion for entry of an order authorizing and approving (1) the sale of certain of the Debtor's assets related to its Grandy's ownership and franchise operation free and clear of liens, claims, and interests pursuant to 11 U.S.C. §§ 363(b) and (f), and (2) the assumption and assignment of related unexpired leases and executory contracts ("Motion") brought by Spectrum Restaurant Group, Inc., a Delaware corporation; Grandy's, Inc., a California corporation; Spoons Restaurants, Inc., a Texas corporation; Spectrum Foods, Inc., a California corporation; Crabby Bob's Franchise Corp., a California corporation; Local Favorite, Inc., a California corporation; Substantively consolidated reorganized debtors under Case No. SA 03-15911 ES (collectively, the "Debtor"). The hearing will take place in **Courtroom 5D** of the United States Bankruptcy Court located at **411 West Fourth Street, Santa Ana, California 92701**.

**PLEASE TAKE FURTHER NOTICE** that a copy of the Motion is attached hereto and served concurrently herewith. The bases for the requested relief are as set forth in the Motion.

**PLEASE TAKE FURTHER NOTICE** that Local Bankruptcy Rule 9013-1(a)(7) provides:

> "Unless otherwise ordered by the court, each interested party opposing, joining, or responding to the motion shall file and serve not later than 14 days before the date designated for hearing either:
>
> (A) A brief but complete written statement of all reasons in opposition thereto or in support or joinder thereof, and answering memorandum of points and authorities, declarations and copies of all photographs and documentary evidence on which the responding party intends to rely. The opposing papers shall advise the adverse party that any reply to the opposition shall be filed with the court and served on the

1

opposing party not later than 7 calendar days (not excluding Saturdays, Sundays, and legal holidays) prior to the hearing on the motion; or

        (B)    A written statement that the motion will not be opposed."

**PLEASE TAKE FURTHER NOTICE** that Local Bankruptcy Rule 9013-1(a)(11) provides:

"Papers not timely filed and served may be deemed by the court to be consent to the granting or denial of the motion, as the case may be."

DATE: January 8 , 2007

WEILAND, GOLDEN,
SMILEY, WANG EKVALL & STROK, LLP

By: _____
    HUTCHISON B. MELTZER
    Attorneys for Debtor and
    Debtor-in-Possession

2

SALE NOTICE

# TABLE OF CONTENTS

|  |  |  | Page No. |
|---|---|---|---|
| I. | INTRODUCTION | | 1 |
| II. | JURISDICTION | | 1 |
| III. | FACTUAL BACKGROUND | | 2 |
| | A. | General Background | 2 |
| | B. | The Prior Chapter 11 Case | 2 |
| | C. | The Grandy's Business | 2 |
| | D. | Debtor's Retention of XRoads/Marketing Efforts | 3 |
| IV. | THE ASSET PURCHASE AGREEMENT | | 4 |
| | A. | The Purchased Assets | 4 |
| | | 1.  Franchise Restaurants. | 4 |
| | | 2.  Prototype Restaurant. | 4 |
| | | 3.  Office Facilities. | 5 |
| | | 4.  Managed Restaurants. | 5 |
| | |    a.  Sold Managed Restaurants. | 5 |
| | |    b.  Retained Managed Restaurants. | 5 |
| | | 5.  Personal Property. | 6 |
| | | 6.  Paid Deposits. | 6 |
| | | 7.  Accounts Receivable. | 6 |
| | | 8.  Promissory Notes. | 6 |
| | | 9.  Certain Insurance Claims. | 6 |
| | | 10.  Rights to Assigned Cross-Over Assets. | 6 |
| | B. | Excluded Assets. | 6 |
| | C. | Purchase Price | 7 |
| | D. | Closing Date | 7 |
| V. | THE OVERBID PROCEDURES | | 7 |
| VI. | SALE APPROVAL HEARING | | 8 |

208177_3.DOC

VII.   THE PROPOSED ASSUMPTION AND ASSIGNMENT OF THE
       LEASES AND CONTRACTS ........................................................................ 9

VIII.  PERSONAL PROPERTY TAXES ................................................................ 10

IX.    MEMORANDUM OF POINTS AND AUTHORITIES.......................................... 10

       A.   This Court Should Authorize The Sale Of The Grandy's
            Business Pursuant To 11 U.S.C. § 363(b)............................................. 10

       B.   The Court Should Approve The Sale Free And Clear Of
            Liens, Claims And Interests .................................................................. 11

       C.   The Successful Bidder Is Entitled To A Good Faith Purchaser
            Finding Under Section 363 .................................................................... 12

       D.   The Debtor Should Be Authorized To Assume And Assign
            The  Leases And Contracts Related To The Grandy's
            Business In Connection With The Sale ................................................. 13

            1.   Assumption of the Leases and Contracts and Payment
                 of the Cure Amounts .................................................................... 13

            2.   Adequate Assurance of Future Performance.............................. 13

       E.   The Debtor May Assume Only Those Leases Being Assigned
            to the Successful Bidder, and May Reject the Remaining
            Leases .................................................................................................. 14

            1.   The Master Lease is Divisible ...................................................... 14

                 a.   Intent of the Parties ............................................................ 15

                      (1)   The Provision Re: Landlord's Ability to
                            Transfer Individual Properties................................. 16

                      (2)   Provision Re: Rent Reduction Due to
                            Severance of Properties.......................................... 16

                 b.   Subject Matter of the Agreement........................................ 17

                 c.   Conduct of the Parties......................................................... 18

       F.   The Court Should Shorten the Ten-Day Period for the
            Effectiveness of This Order .................................................................. 18

X.     CONCLUSION ........................................................................................... 19

DECLARATION OF KENNETH MUCHA ....................................................... 20

DECLARATION OF ALEXANDER W. STEVENSON ................................... 24

# TABLE OF AUTHORITIES

## CASES

Page No.

Blackstock v. Gribble,
  312 S.W.2d 289 (Tex.Civ.App.-Eastland 1958).................................................. 15

Butner v. United States,
  440 U.S. 48, 99 S.Ct. 914, 917, 59 L.Ed.2d 136 (1979).................................... 14

Community Thrift & Loan v. Suchy,
  786 F.2d 900 (9th Cir.1985) ............................................................................. 12

In re Continental Air Lines, Inc.,
  780 F.2d 1223 (5th Cir. 1986) .......................................................................... 10

In re Convenience USA, Inc.,
  2002 WL 230772 (Bankr. M.D.N.C. 2002)..................................14, 15, 16, 17, 18

In re Filtercorp, Inc.,
  163 F.3d 570 (9th. Cir. 1998) ........................................................................... 12

In re GP Express Airlines, Inc.,
  200 B. R. 222 (Bankr. D. Neb. 1996)................................................................. 13

In re Lionel Corp.,
  722 F.2d 1063 (2nd Cir. 1983)........................................................................... 10

In re Payless Cashways, Inc.,
  230 B.R. at 135 ......................................................................................... 15, 16

In re Walter,
  83 B.R. 14 (9th Cir. 1988) ................................................................................ 10

In re Wolflin,
  318 B.R. 392 (Bankr. N.D. Tex. 2004)............................................................... 15

Los Angeles Gas & Elec. Co. v. Amalgamated Oil Co.,
  156 Cal. 776 ................................................................................................... 15

Phar-Mor, Inc. v. Strouss Building Associates,
  204 B.R. 948 (N.D. Ohio 1997) ........................................................................ 13

Stewart Title Guaranty Company v. Old Republic National Title Insurance Co.,
  83 F.3d 735 (5th Cir. 1996) .............................................................................. 16

## STATUTES

11 U.S.C. § 363 .......................................................................2, 10, 11, 12, 13, 21, 25

11 U.S.C. § 365 .................................................................................... 2, 13, 14

11 U.S.C. §§ 101-1330 ...................................................................................... 2

28 U.S.C. § 157 ................................................................................................ 1

28 U.S.C. § 1334 .............................................................................................. 1

28 U.S.C. § 1408 .............................................................................................. 1

28 U.S.C. § 1409 .............................................................................................. 1

## **RULES**

Federal Rule of Bankruptcy Rule 6004 ................................................. 18, 19

Local Bankruptcy Rule 9013-1 ................................................................ 7

## MOTION

The Debtor submits this Motion with the support of The Official Committee of Creditors Holding General Unsecured Claims (the "Committee") and the Debtor's largest secured creditor, BET Associates, L.P. ("BET"). In support of the Motion, the Debtor submits the following memorandum of points and authorities, the declarations of Kenneth Mucha and Alexander W. Stevenson, and respectfully represents as follows:

## I.    INTRODUCTION

By this Motion, the Debtor seeks to sell ("Sale") assets of the Debtor that relate solely to the portion of the Debtor's business that consists of the development, marketing, management, operation and franchise management of Grandy's restaurants ("Grandy's Business") to Jon Bangash ("Initial Bidder"), or a successful overbidder ("Overbidder") on terms at least as favorable as those offered by the Initial Bidder. The Debtor has determined that it is in the best interest of the estate to sell the Grandy's Business. In connection with the Sale, the Debtor also seeks to assume and assign certain unexpired leases and executory contracts related to the Grandy's Business. The Grandy's Business has been extensively marketed both prior to and after the bankruptcy filing. The Debtor continues to entertain inquiries from parties interested in acquiring the Grandy's Business and will consider qualified overbids through the Auction (defined below) in order to maximize value from the Sale.

## II.    JURISDICTION

This Court has jurisdiction over this Motion pursuant to 28 U.S.C. §§ 157 and 1334. This matter is a core proceeding pursuant to 28 U.S.C. § 157(b)(2. Venue is proper before this Court pursuant to 28 U.S.C. §§ 1408 and 1409.

The statutory predicates for the relief requested in this Motion are sections 363 and 365 of title 11 of the United States Code, 11 U.S.C. §§ 101-1330 (the "Bankruptcy Code").

III.   **FACTUAL BACKGROUND**

A.   **General Background**

SRG, formerly known as NBACO, Inc., was formed in or about May 1999 for the purpose of acquiring, owning, operating and franchising restaurants, and developing restaurant concepts.  Anwar Soliman, the founder of SRG, owns all of the outstanding common stock of SRG.  He also served as an officer and a member of the Board of Directors, but has resigned all of his positions with SRG.  The Debtor filed a voluntary petition under chapter 11 of Title 11 of the United States Code on August 29, 2006 ("Petition Date"), commencing the instant case.

B.   **The Prior Chapter 11 Case**

On August 6, 2003, SRG, along with Grandy's, Spoons, Spectrum, Crabby Bob's and Local Favorite filed voluntary chapter 11 petitions before the United States Bankruptcy Court, as Case Numbers:  SA 03-15911 RA, SA 03-15916 RA, SA 03-15913 RA, SA 03-15915 RA, SA 03-15912 RA and SA 03-15914 RA.  SRG owned all of the common stock of the five other debtors.

Grandy's, Spoons, Spectrum and Local Favorite were acquired by SRG, in or about June 2000, from American Restaurant Group, Inc., of which Soliman was then CEO.  SRG incurred approximately $15 million in debt to Fleet/Bank of Boston ("Fleet") and BET in order to complete the acquisition.  Crabby Bob's was acquired by SRG in or about October 2001, for $1.8 million in cash and $400,000 in notes.  All outstanding notes related to the Crabby Bob's acquisition were retired by January 31, 2002.  Under a plan of reorganization confirmed in August 2004, the various chapter 11 estates were substantively consolidated into the SRG estate.  At the time of confirmation, BET had acquired the Fleet secured claim.

C.   **The Grandy's Business**

The Debtor anticipates that at the time of the Sale, the Grandy's Business will consist of 72 Grandy's restaurants comprised of a single owned and operated prototype restaurant, a single owned and operated managed restaurant for sale, and 70 franchised

1   restaurants. Grandy's restaurants are family-owned, quick-service restaurants that

2   serve moderately-priced, home-style "Southern" meals. Most of the Grandy's

3   restaurants are located in Texas and Oklahoma, and the restaurants are typically located

4   in free standing structures situated near shopping malls or other highly visible and

5   trafficked locations.

6   **D.      Debtor's Retention of XRoads/Marketing Efforts**

7   By Order entered November 2, 2006, the Debtor was authorized to retain XRoads

8   Solutions Group, LLC ("XRoads") as its financial advisor to market and sell the Grandy's

9   Business. XRoads has marketed the Grandy's Business on a national basis to in excess

10  of 220 potentially interested parties. The Debtor prepared, with the assistance of

11  XRoads, a two-page investment summary (the "Teaser") and a comprehensive

12  confidential information memorandum containing substantial financial and qualitative

13  information concerning the Grandy's Business (the "CIM"). XRoads began contacting

14  potentially interested parties as well as receiving direct inquiries from third parties in

15  October 2006. XRoads sent a Non-Disclosure Agreement ("NDA") and the Teaser to

16  141 parties. Of those 141 parties, 32 have executed NDAs and were sent the CIM and

17  provided access to an online dataroom established by XRoads that contained

18  substantially all the relevant contracts (franchise agreements, leases, vendor contracts,

19  etc.) as well as additional financial information concerning the operations and financial

20  performance of the Grandy's Business. Numerous telephone conversations and

21  in-person meetings were also held with both XRoads representatives and management

22  representatives to facilitate and encourage the parties to bid.

23  On or about November 16, 2006, XRoads received five preliminary indications of

24  interest from potential bidders. Those parties were invited to conduct additional due

25  diligence prior to submitting final, binding proposals in the form of a marked up asset

26  purchase agreement. Bids were received on December 18, 2006.

27

28

208177_3.DOC

3

## IV.    **THE ASSET PURCHASE AGREEMENT**

After additional negotiations, the Debtor and the Initial Bidder finalized a definitive Asset Purchase Agreement ("<u>APA</u>")[1], a copy of which is attached as Exhibit 1, for the purchase of substantially all the assets of the Grandy's Business (the "<u>Initial Bid</u>").

### A.    **The Purchased Assets**

The Purchased Assets[2] being sold pursuant to the APA (which constitute the Grandy's Business) are:

#### 1.    **Franchise Restaurants.**

With respect to the Franchise Restaurants, the Purchased Assets include all of the Debtor's rights, titles and interests as the: (1) Franchisor under the Franchise Agreements; (2) Lessee under the Franchise Restaurant Real Property Leases; (3) Sublessor under the Franchise Restaurant Real Property Subleases; (4) Lessee under the Franchise Restaurant Equipment Leases; (5) Sublessor under the Franchise Restaurant Equipment Subleases; (6) Owner of the Franchise Restaurant Equipment, if any, located at the Franchise Restaurants or used exclusively  in the management and operation of the Franchise Restaurants; and (7) Owner of any building in which a Franchise Restaurant is located if any such ownership interest exists.

#### 2.    **Prototype Restaurant.**

With respect to the Prototype Restaurant located in Lewisville, Texas, the Purchased Assets include all of the Debtor's rights, titles and interests as the: (1) Lessee under the Prototype Restaurant Real Property Lease; (2) Lessee under the Prototype Restaurant Equipment Leases; (3) Vendee under the Prototype Restaurant Contracts; (4) Owner of the Prototype Restaurant Equipment; (5) Owner of the Prototype Restaurant Inventory; (6) Owner of the Prototype Restaurant Operating Cash; and

---

[1]    To the extent there is any inconsistency or discrepancy between the terms of the APA set forth in this Motion and the APA, the terms of the APA control.

[2]    All capitalized terms not otherwise defined in the Motion shall have the same meaning ascribed to them in the APA.

1  (7) Owner of any building in which a Franchise Restaurant is located if any such

2  ownership interest exists.

3            **3.      Office Facilities.**

4            With respect to the Office Facilities located in Lewisville, Texas, the Purchased

5  Assets include all of the Debtor's rights, titles and interests as the: (1) Lessee under the

6  Office Equipment Lease; (2) Vendee under the Office Contracts; (3) Owner of the Office

7  Equipment and Supplies.  The Purchased Assets, however, do not include the Office

8  Premises or the Office Real Property Lease.

9            **4.      Managed Restaurants.**

10                     a.      Sold Managed Restaurants.

11           With respect to Managed Restaurants which are sold prior to Closing the

12  Managed Restaurant will be deemed a Franchise Restaurant for all purposes relating to

13  the APA and the Purchased Assets will include all of the Debtor's rights, titles and

14  interests as the: (1) Franchisor under the Franchise Agreement for the Managed

15  Restaurant; (2) Lessee under the real property lease for the Managed Restaurant; (3)

16  Sublessor under the real property sublease for the Managed Restaurant; (4) Lessee

17  under the equipment leases for the Managed Restaurant; (5) Sublessor under the

18  equipment subleases for the Managed Restaurant; and (5) Owner of the equipment,

19  fixtures, trade fixtures, furniture, and furnishings for such Sold Restaurant, if any, located

20  at the Sold Restaurant or used exclusively in the management and operation of the Sold

21  Restaurant.

22           With respect to the sale of any Sold Restaurant prior to Closing, the seller of the

23  Managed Restaurant (*i.e.*, the Debtor and/or the Lender) will receive and retain all

24  proceeds of the sale (of any nature).

25                     b.      Retained Managed Restaurants.

26           With respect to any Managed Restaurants still operated by Debtor at the time of

27  Closing (whether owned by the Debtor or Lender), in addition to the assets described in

28  the section above, the Purchased Assets will include all of the Debtor's rights, titles and

1   interests as the: (1) Manager under the Management Agreement between the Debtor

2   and Lender for such Managed Restaurant (if applicable); and (2) Vendee under the

3   purchase orders, supply contracts, manufacturing contracts and other agreements for

4   the Managed Restaurant and any such purchase orders, supply contracts,

5   manufacturing contracts and other agreements will be deemed Prototype Restaurant

6   Contracts for all purposes related to the Agreement.

7          **5.**    **Personal Property.**

8       The Purchased Assets include all Personal Property used by the Debtor

9   exclusively in the operation of the Grandy's Business.

10          **6.**    **Paid Deposits.**

11       The Purchased Assets include all Paid Deposits which have not been applied to

12   any obligation of the Debtor at the time of Closing.

13          **7.**    **Accounts Receivable.**

14       The Purchased Assets include all  Accounts Receivable that are owed to the

15   Debtor at the time of Closing.

16          **8.**    **Promissory Notes.**

17       The Purchased Assets include all Promissory Notes.  With respect to any

18   promissory notes received in consideration for the sale of a Franchise Restaurant

19   following the Effective Date, but prior to Closing, the Purchase Price shall be increased

20   by an amount equal to 72.5% of the unpaid balance of such promissory note as of the

21   Closing.

22          **9.**    **Certain Insurance Claims.**

23       The Purchased Assets include the specified Assigned Insurance Claims.

24          **10.**    **Rights to Assigned Cross-Over Assets.**

25       The Purchased Assets include certain specified Cross-Over Assets.

26   **B.**    **Excluded Assets.**

27       The Purchased Assets do not include certain Excluded Assets set forth in the

28   APA, which Excluded Assets include, but are not limited to, securities of the Debtor,

6
SALE MOTION

1   cash and cash equivalents, assets related to the business or business opportunities of

2   the Debtor other than the Grandy's Business, tax refunds and credits, letter of credit,

3   rights of the Debtor against current or former insiders or professionals of the Debtor,

4   confidential or private information regarding employees, attorney-client privileges and

5   work-product materials of the Debtor, and avoidance actions arising under the

6   Bankruptcy Code.

7   **C.   Purchase Price**

8   The purchase price set forth in the APA is $6,450,000, subject to adjustment as

9   set forth in the APA. As part of the consideration under the APA, the Initial Bidder has

10  made a good faith deposit of $250,000 into an escrow account.[3] The deposit shall be

11  refundable to the Initial Bidder as provided in the APA. The Initial Bid is subject to

12  overbid, as described below.

13  **D.   Closing Date**

14  The Outside Date for Closing is February 21, 2007, however, Closing may occur

15  earlier as provided in the APA.

16

17  **V.   THE OVERBID PROCEDURES**

18  The Debtor has filed a Motion For Order Approving (1) Overbid Procedures And

19  (2) Notice Procedures For Sale Of Certain Of Debtor's Assets (Grandy's) ("Bidding

20  Procedures Motion"), which will be heard on January 16, 2007 at 10:30 a.m. The

21  proposed overbid procedures (the "Overbid Procedures") provide that the Debtor will

22  conduct an auction sale (the "Auction") in connection with the Grandy's Business at

23

24  ---

     [3]  As additional consideration under the APA, the Initial Bidder will be solely responsible for the
     payment of any broker's fee or finder's fee or commission allegedly due or owing to Ahmed Mahmud dba
25   Global Business Group, Inc. in connection with a sale of the Grandy's Business to the Initial Bidder.
     Pursuant to a settlement agreement between the parties, the Initial Bidder's obligation has been fixed at
     $20,000 and Mr. Mahmud and Global Business Group, Inc. will release the Debtor and its estate from any
26   and all claims. No broker's fee or finder's fee or commission will be due or owing to Ahmed Mahmud or
     Global Business Group, Inc., if the Initial Bidder is not the Successful Bidder. The Debtor has already filed
27   and served a motion to approve the settlement agreement in accordance with the "no hearing" procedures
     set forth in Local Bankruptcy Rule 9013-1. The motion should be approved before the hearing on this
28   Motion provided that no timely objections are received.

208177_3.DOC                                                7                                    SALE MOTION

1   Debtor's counsel's office on January 30, 2007, at 10:00 a.m.  Qualified Bidders (as

2   defined in the Bidding Procedures Motion) may bid at the Auction.  After the Auction, the

3   Debtor will determine in its sole discretion in consultation with the Committee and BET

4   and subject to Court approval, what is the highest and best bid ("Successful Bid").  For a

5   bid to become the Successful Bid it must include terms at least as favorable to the

6   Debtor as those set forth in the APA with the Initial Bidder.  Once the Court approves the

7   Bidding Procedures Motion, the Debtor will inform all potentially interested buyers of the

8   Overbid Procedures.[4]

9

10   **VI.    SALE APPROVAL HEARING**

11          Pursuant to the Overbid Procedures, at the hearing on this Motion ("Sale

12   Hearing"), the Debtor will seek approval of the Sale to the Successful Bidder and of the

13   assumption and assignment of the unexpired leases and executory contracts related to

14   locations actually sold to the Successful Bidder.

15          Following the Sale Hearing, if the Successful Bidder fails to consummate the Sale

16   by the Outside Date because of a breach or failure to perform on the part of the

17   Successful Bidder, the next highest and best bid of a Qualified Bidder will be deemed to

18   be the new Successful Bid and the Debtor will be authorized, but not required, to

19   consummate the Sale with the new Successful Bidder without further order of the

20   Bankruptcy Court.  In such case, the defaulting Successful Bidder's deposit shall be

21   forfeited to the Debtor, and the Debtor specifically reserves the right to seek all available

22   damages against the defaulting Successful Bidder.  The new Successful Bidder shall be

23   required to close the Sale within 10 days of the Outside Date (as defined in the APA) or

24   such later date, if extended by the Debtor in its sole and absolute discretion, which is not

25   more than 25 days from the Outside Date.

26

27   _____

28   [4]  On December 22, 2006, the Debtor served the Bidding Procedures Motion on all potentially
interested buyers.

**VII.    THE PROPOSED ASSUMPTION AND ASSIGNMENT OF THE LEASES**
**AND CONTRACTS**

The Debtor seeks to assume and assign to the Successful Bidder the unexpired real property leases ("Leases") and equipment leases and executory contracts ("Contracts") related to the Grandy's Business. The Leases include real property leases pursuant to which the Debtor is the lessee and leases pursuant to which the Debtor is the sublessor. The Leases and applicable cure amounts are described in Exhibit 2. The Contracts include, *inter alia*, the Franchise Agreements, the Management Agreements (related to the Managed Stores), equipment leases and subleases, and food distributor and sub-distributor agreements. The Contracts and applicable cure amounts are listed in Exhibit 3.

If a Lease or Contract is assumed and assigned pursuant to this Court's order, the Debtor proposes that, unless the landlords or contracting parties properly file and serve an objection to the cure amounts set forth on Exhibits 2 and 3, then the landlords or contracting parties will receive at the time of the Sale closing (or promptly thereafter), the cure amounts set forth on Exhibits 2 and 3. Disputed cure amounts will be escrowed as to not impede the closing of the transaction.

If the Debtor identifies additional Leases or Contracts not listed in Exhibits 2 and 3 that might be assumed and assigned to the Successful Bidder, the Debtor seeks authority to send a supplemental cure notice to the landlords or contracting parties, as applicable. If a landlord or contracting party does not object to the cure amount set forth in the supplemental cure notice within five (5) business days of service, the Debtor will pay the cure amount as set forth in the supplemental cure notice if the newly identified Lease or Contract is assumed and assigned to the Successful Bidder.

The Debtor may delete any Leases or Contracts from Exhibits 2 and 3 at any time prior to the hearing on this Motion depending on the preferences of the Successful Bidder. Notwithstanding anything to the contrary, no Leases or Contracts will be assumed unless and until the Sale of the Grandy's Business closes.

1   The proposed Overbid Procedures currently require Qualified Bidders to submit

2   financial information five (5) days before the Auction.  This information will be available

3   to the landlords of the Leases and parties to the Contracts, subject to any confidentiality

4   restrictions from the Qualified Bidders.

5

6   **VIII.   PERSONAL PROPERTY TAXES**

7   There are certain personal property taxes purportedly owed by the Debtor related

8   to the Grandy's Business ("Personal Property Taxes").  A schedule of the Personal

9   Property Taxes asserted by the taxing authorities with respect to each location is

10   attached as Exhibit 4.  The taxing authorities to whom Personal Property Taxes might be

11   owed may assert liens against the personal property located at the Grandy's locations.

12   The Debtor does not admit and may dispute whether such liens exist at all.  In

13   connection with the Sale of the Grandy's Business, the Debtor will set aside funds from

14   the Sale proceeds sufficient to pay all allowed secured claims related to the Personal

15   Property Taxes, with respect to each location actually sold, but in no event more than

16   $92,287.40.

17

18   **IX.   MEMORANDUM OF POINTS AND AUTHORITIES**

19   **A.   This Court Should Authorize The Sale Of The Grandy's**

20   **Business Pursuant To 11 U.S.C. § 363(b)**

21   Pursuant to 11 U.S.C. § 363 (b)(1), the Debtor may use, sell, or lease, other than

22   in the ordinary course of business, property of the estate.  The Ninth Circuit has held that

23   there must be a good business reason for the use, sale or lease of estate property

24   outside the ordinary course of business.  See In re Walter, 83 B.R. 14, 19-20 (9th Cir.

25   1988); See also In re Continental Air Lines, Inc., 780 F.2d 1223, 1226 (5th Cir.

26   1986) (held that there must be some articulated business justification for the court to

27   approve the use, sale, or lease of property outside the ordinary course of business); See

28   also In re Lionel Corp., 722 F.2d 1063, 1071 (2nd Cir. 1983) (court should consider all

10                              SALE MOTION

1   salient factors pertaining to proceeding to determine whether there is good business

2   reason for use, sale and lease of property outside the ordinary course of business).

3        Due to the Overbid Procedures and the marketing efforts described above, the

4   Debtor believes that the Sale will result in the most value possible being recovered by

5   the Debtor for the Grandy's Business.  Accordingly, the Sale of the Grandy's Business

6   on the proposed terms should be approved.

7   **B.    The Court Should Approve The Sale Free And Clear Of Liens,**

8   **Claims And Interests**

9        The Debtor seeks authority to sell the Grandy's Business free and clear of all

10  liens, claims, and interests pursuant to Section 363(f) of the Bankruptcy Code.  Section

11  363(f) of the Bankruptcy Code describes the circumstances under which a trustee or a

12  debtor may sell property of the estate free and clear of any interest of third parties in

13  such property. Section 363(f) provides:

14       The Debtor may sell property under subsection (b) or (c) of
         this section free and clear of any interest in such property of
15       an entity other than the estate, only if –

16           (1)  applicable nonbankruptcy law permits sale of such
         property free and clear of such interest;

17           (2)  such entity consents;

18           (3)  such interest is a lien and the price at which such
         property is to be sold is greater than the aggregate value of
19       all liens on such property;

20           (4)  such interest is in bona fide dispute; or

21           (5)  such entity could be compelled, in a legal or
         equitable proceeding, to accept a money satisfaction of such
         interest.

22       Because subsections (1) through (5) of Bankruptcy Code
         Section 363(f) are written in the disjunctive, authority to sell
23       the Grandy's Business free and clear of any and all interests
         therein should be granted if any of the conditions are met with
24       respect to each interest holder.

25       Here, the primary lien asserted against the assets being sold is BET's and BET

26  consents to the Sale.   Moreover, BET's lien will attach to the Sale proceeds with the

27  same extent, validity, and priority as BET's prepetition lien on the collateral being sold.

28

208177_3.DOC

11

1   Further, the value derived from this Sale will be greater than what would be

2   received if the Grandy's Business was liquidated and not sold as a going concern and,

3   thus, any parties with interests in the Grandy's Business will benefit from the Sale.

4   Moreover, any interest holder could be compelled, in a legal or equitable proceeding, to

5   accept a money satisfaction of "their interests."  On these facts, relief is warranted under

6   Section 363(f)(5) as well.

7   With respect to any personal property tax liens, the Debtor will set aside funds

8   from the Sale proceeds to pay the allowed secured claims related to the Personal

9   Property Taxes, with respect to each Grandy's location actually sold.

10   **C.**   **The Successful Bidder Is Entitled To A Good Faith Purchaser**

11   **Finding Under Section 363**

12   11 U.S.C. § 363(m) provides:

13   The reversal or modification on appeal of an authorization
     under subsection (b) or (c) of this section of a sale or lease of
14   property does not affect the validity of a sale or lease under
     such authorization to any entity that purchased or leased
15   such property in good faith, whether or not such entity knew
     of the pendency of the appeal, unless such authorization and
16   such sale or lease were stayed pending appeal.

17   A good faith purchaser under Section 363(m) is one who purchases for "value"

18   and there is no fraud or collusion in the bidding process.  In re Filtercorp, Inc., 163

19   F.3d 570 (9th. Cir. 1998), the Ninth Circuit held that an insider-purchaser was a good

20   faith purchaser under Section 363(m): "A good faith buyer is one who buys 'in good faith'

21   and 'for value.' . . .  Lack of good faith is [typically] shown by 'fraud, collusion between

22   the purchaser and other bidders or the trustee, or an attempt to take grossly unfair

23   advantage of other bidders.'" (quoting Community Thrift & Loan v. Suchy, 786 F.2d 900,

24   902 (9th Cir. 1985)).  Id. at 577.

25   Based on the foregoing, the Overbid Procedures, and the fact that there is no

26   collusion between the Debtor and any potential bidder, the Debtor submits that the

27   Successful Bidder will be found to be a good faith purchaser under Section 363(m).

28

208177_3.DOC

12

SALE MOTION

D.    **The Debtor Should Be Authorized To Assume And Assign The Leases And Contracts Related To The Grandy's Business In Connection With The Sale**

1.    **Assumption of the Leases and Contracts and Payment of the Cure Amounts**

Subject to exceptions not relevant here, Section 365(a) of the Bankruptcy Code provides that a debtor "subject to the court's approval, may assume or reject any executory contract or unexpired lease of the debtor." 11 U.S.C. § 365(a).  A bankruptcy court may authorize a debtor to assume any executory contract or unexpired lease of the debtor if doing so is within the sound business judgment of the debtor.  See Phar-Mor, Inc. v. Strouss Building Associates, 204 B.R. 948, 951-52 (N.D. Ohio 1997); In re GP Express Airlines, Inc., 200 B. R. 222, 230 (Bankr. D. Neb. 1996).  Section 365(b) of the Bankruptcy Code provides that, in order for a debtor to assume a lease under which there has been a default not resulting from insolvency, the debtor must cure or provide adequate assurance of the prompt cure of the default, provide compensation for pecuniary losses suffered as a result of the default and provide adequate assurance of future performance.

The Debtor seeks to assume and assign the Leases and Contracts to the Successful Bidder in connection with the Sale.  The Debtor requests that the assumption of these leases be made effective as of the closing date of the Sale and that the Debtor be authorized to pay the cure amounts from the Sale proceeds after they are received.

2.    **Adequate Assurance of Future Performance**

In order to assign an executory contract or unexpired lease, a debtor is required to provide adequate assurance of future performance thereunder by the assignee. 11 U.S.C. § 365(b)(1)(c).  Any Successful Bidder must first be deemed qualified by the Debtor, in consultation with BET and the Committee.  Further, the landlords on the Leases and other parties to the Contracts will have access to financial information of the Successful Bidder.  Accordingly, the landlords and parties to the Contracts will have

13

SALE MOTION

1   adequate assurance that the Successful Bidder will be able to perform in the future with

2   respect to the assigned Leases and Contracts.

3       **E.**      **The Debtor May Assume Only Those Leases Being Assigned to**

4                **the Successful Bidder, and May Reject the Remaining Leases**

5       The Debtor leases 27 of the Grandy's locations pursuant to a Ground Lease

6   Agreement with CNL APF Partners, LP and USRP Funding 2001-A, LP (collectively,

7   "CNL"), subject to certain amendments (the "Master Lease"). A copy of the Master

8   Lease is attached as Exhibit 5. The Master Lease was initially entered into between the

9   Debtor and U.S. Restaurant Properties Operating L.P. ("USRP"). CNL subsequently

10  succeeded to USRP's interests with respect to the Master Lease. The Debtor subleases

11  locations covered by the Master Lease to its franchisees.

12      Depending on the preferences of the Successful Bidder, the Debtor may reject

13  certain Leases under the Master Lease (the "Rejected Leases"). The Initial Bidder has

14  already designated certain Leases under the Master Lease for rejection (which list may

15  change depending on the preferences of the Successful Bidder).   Under applicable law,

16  the Rejected Leases may be "severed" from the Master Lease and rejected, while the

17  leases related to the remaining locations subject to the Master Lease may be assumed

18  and assigned, because the Master Lease is "divisible."

19      **1.**      **The Master Lease is Divisible**

20      Determination of contract or property rights by the bankruptcy courts ordinarily is

21  controlled by state law. See Butner v. United States, 440 U.S. 48, 54, 99 S.Ct. 914, 917-

22  18, 59 L.Ed.2d 136 (1979). Here, the Master Lease, at section 18.15, provides that the

23  lease shall be governed by the laws of the State of Texas.

24      In In re Convenience USA, Inc., 2002 WL 230772 (Bankr. M.D.N.C. 2002)

25  ("Convenience"), a case directly on point, the bankruptcy court, applying Texas law,

26  decided the issue of the severability of a lease based on facts nearly identical to those in

27  the instant case. The lease at issue ("Convenience Lease") was entered into with USRP

28  (CNL's predecessor in interest with respect to the Master Lease) and contains terms

substantially similar to those in the Master Lease.  The court summarized Texas law on

the severability of leases as follows:

> The concept of divisible contracts is recognized under Texas law. See In re Payless Cashways, Inc., 230 B.R. 120, 135 (8th Cir. BAP1999) (discussing Texas law), aff'd. 203 F.3d 1081 (8th Cir.1999). Under Texas law, there is no one test or criterion that is determinative as to whether a contract is entire or divisible. See Johnson v. Walker, 824 S.W.2d 184, 187 (Tex.App.-Ft. Worth 1991); St. John v. Barker, 638 S.W.2d 239, 243 (Tex.App.1982); Chapman v. Tyler Bank & Trust Co., 396 S.W.2d 143, 146 (Tex.Civ.App.-Tyler 1965). The determination of whether a contract is divisible depends primarily upon the intent of the parties, the subject matter of the agreement and the conduct of the parties. See Walker, 824 S.W.2d at 187; St. John, 638 S.W.2d at 243; Chapman, 396 S.W.2d at 146-47. . . A frequently used test under Texas law to determine the divisibility of a contract is whether the consideration for the agreement is apportionable, and it generally is held that a contract is divisible where the part to be performed by one party consists of several distinct and separate items and the price to be paid by the other party is apportioned to each item. See Walker, 824 S.W.2d at 187; Click v. Seale, 519 S.W.2d 913, 918 (Tex.Civ.App.-Austin 1975); Chapman, 396 S.W.2d at 146-147.

Id. at 3; see also In re Wolflin, 318 B.R. 392 (Bankr. N.D. Tex. 2004) (same test for

severability described).[5]

That multiple locations are covered by a single lease is not controlling or decisive

with respect to the issue of severability. See Convenience at 3  ("Single assent to a

whole transaction involving several parts indicates that a contract is entire. However, the

mere fact that agreements are embraced in one instrument will not make the writing

entire and indivisible.  See Click, 519 S.W.2d at 918.")

a.      Intent of the Parties

"The intention of the parties as determined by the language used in a contract is

controlling in determining whether the contract is severable or is entire and indivisible."

Blackstock v. Gribble, 312 S.W.2d 289, 292-293 (Tex.Civ.App.-Eastland 1958); See also

---

[5]    The test for divisibility of a contract is similar under California law.  See Los Angeles Gas & Elec. Co. v. Amalgamated Oil Co., 156 Cal. 776, 779 ("Whether a contract is entire or severable is a question of interpretation. The intent of the parties is to be ascertained from a consideration of the language employed and the subject-matter of the contract. . . .It is, no doubt, well settled, as has been repeatedly declared by this court, that 'when the price is expressly apportioned by the contract, or the apportionment may be implied by law, to each item to be performed, the contract will generally be held to be severable.'")

1    In re Payless Cashways, Inc., 230 B.R. at 135 ("In the end, the intent of the parties, as

2    demonstrated by the language used, is controlling."); Stewart Title Guaranty Company

3    v. Old Republic National Title Insurance Co., 83 F.3d 735, 739 (5th Cir. 1996) ("The

4    intent of the parties is the principal determination in divisibility")

5        Here, as in Convenience, the language of the Master Lease shows the intent of

6    the parties that the leases be severable:

7                    (1)    The Provision Re: Landlord's Ability to Transfer

8                            Individual Properties

9        The Master Lease, at section 18.2, provides that the landlord (CNL) can transfer

10   "less than all" of the properties leased under the Master Lease and that, in such a

11   circumstance, the Debtor and the transferee (i.e., the new landlord) will enter into a new

12   lease (defined in the Master Lease as an "Individual Lease") for the remaining term of

13   the Master Lease.  After the severance of the transferred location, the base rent under

14   the Master Lease is to be reduced by an amount equal to the rent under the new

15   Individual Lease, and the Master Lease stays in effect with respect to the remaining

16   properties.

17       This provision alone is sufficient to show the intent of the parties for the Master

18   Lease to be divisible, as it, in fact, provides for the severance of locations from the

19   Master Lease and a reduction of the remaining rent by the amount apportioned to that

20   severed location.

21       Addressing a similar provision in the Convenience Lease, the Convenience court

22   held that, based upon this provision: "In fact, the lease has to be divisible in order for the

23   landlord to be able to sell the leased properties and still have the lease continue in effect

24   as to the remaining properties."  Id. at 4.

25                   (2)    Provision Re: Rent Reduction Due to

26                            Severance of Properties

27       The Master Lease also provides, at section 1.9, that the base rent under the

28   Master Lease will be reduced proportionately based on the severance of a property from

the Master Lease due to the Debtor's violation of a use provision with respect to a particular location (section 6.1), damage to a particular location (section 13.1), or condemnation of a particular location (article 14).

These allocation of rent provisions further evidence the parties' intent that the Master Lease be severable.  They contemplate that the particular properties may be severed from the Master Lease and that the Master Lease will continue with the rent reduced due to the severance of the remaining properties.  Significantly, the Master Lease does not provide that the Master Lease will terminate if any of the individual locations are no longer subject to the Master Lease.

In Convenience, the court found that similar rent reduction provisions in the Convenience Lease showed a clear intent that the lease was to be divisible.  Id. at 4-5.  Where, as here, "the parties elected to have a contract under which the lease of some of the properties may be terminated without affecting the continuing lease of the remaining properties," "[c]hoosing such terms reflects an intent to have a divisible contract." Id. at 6.

b.    Subject Matter of the Agreement

"The second prong to be considered under Texas law in deciding whether a contract is divisible is the subject matter of the agreement.  A finding that the subject matter of the contract is such that the contract can be divided into two or more separate agreements that can be performed independent of each other weighs in favor of a finding that the contract is divisible." Id.

Here, the subject matter of the Master Lease is the lease of multiple separate and distinct properties.  The locations can be operated separately and independently of each other in accordance with the Master Lease.  Further, as discussed above, there is nothing in the Master Lease that prevents the division of the Master Lease and, the Master Lease, in fact, contemplates such a division.  Accordingly, the subject matter of the Master Lease, multiple separate and independent locations, militates in favor of the divisibility of the lease.  See id. at 6 (The fact that the subject matter of a contract is a

1    lease of properties which can be operated separately and independently of each other

2    weighs in favor of the divisibility of the lease.)

3                  c.      Conduct of the Parties

4         With respect to the conduct of the parties prong, CNL has allocated the pre-

5    petition rent defaults between the individual locations.  CNL provided the allocation

6    schedule attached as Exhibit 6 to the Debtor.  CNL's allocation of rent defaults between

7    the locations shows that the Master Lease is divisible. [6] <u>See id</u>. at 6 (The creation of a

8    schedule allocating rent between locations shows that the lease is divisible).

9       **F.**      **The Court Should Shorten the Ten-Day Period for the**

10            **Effectiveness of This Order**

11         Bankruptcy Rule 6004(g) states: "An order authorizing the use, sale, or lease of

12    property other than cash collateral is stayed until the expiration of 10 days after entry of

13    the order, unless the court orders otherwise." The legislative history states: "The court

14    may, in its discretion, order that Rule 6004(g) is not applicable so that the property may

15    be used, sold, or leased immediately in accordance with the order entered by the court."

16    Accordingly, the Debtor requests that the Court order and authorize that the Sale may be

17    effectuated immediately in order to close the Sale of the Grandy's Business.  Similarly,

18    the Debtor requests that the assignment of the Leases and Contracts be effective

19    immediately upon the closing of the Sale notwithstanding Bankruptcy Rule 6006(d).

20    ///

21    ///

22    ///

23

24

25

26

27

28

---

[6]   The fact that rent may be paid in a single payment on account of all locations has "little significance" in determining whether a lease is divisible. <u>Id.</u> at 6.

1  **X.    CONCLUSION**

2          Based upon the foregoing, the Debtor respectfully requests that the Court grant

3  the Motion, approve the Sale to the Successful Bidder, and approve the assumption and

4  assignment of the Leases and Contracts, waive the stay of the order set forth in Federal

5  Rules of Bankruptcy Procedure 6004(g) and 6006(d), and grant the Debtor such other

6  and further relief as may be just and appropriate under the facts of this case.

7                                      Respectfully submitted,

8  DATE: January _8_, 2007          WEILAND, GOLDEN,
                                     SMILEY, WANG EKVALL & STROK, LLP
9

10                                   By: _____
11                                       HUTCHISON B. MELTZER
                                         Attorneys for Debtor and
12                                       Debtor-in-Possession

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

## **DECLARATION OF KENNETH MUCHA**

I, Kenneth Mucha, declare:

1.      I am the Chief Executive Officer of Spectrum Restaurant Group, Inc., a Delaware corporation ("SRG"); Grandy's, Inc., a California corporation ("Grandy's"); Spoons Restaurants, Inc., a Texas corporation ("Spoons"); Spectrum Foods, Inc., a California corporation ("Spectrum"); Crabby Bob's Franchise Corp., a California corporation ("Crabby Bob's"); Local Favorite, Inc., a California corporation ("Local Favorite"); Substantively consolidated reorganized debtors under Case No. SA 03-15911 ES (collectively, the "Debtor"). I am submitting this declaration in support of the Debtor's motion for entry of an order authorizing and approving (1) the sale of certain of the Debtor's assets related to its Grandy's ownership and franchise operation free and clear of liens, claims, and interests pursuant to 11 U.S.C. §§ 363(b) and (f), and (2) the assumption and assignment of related unexpired leases and executory contracts (the "Motion"). All terms defined in the Motion are incorporated herein by this reference. I know each of the following facts to be true of my own personal knowledge, except as otherwise stated, and if called as a witness, I could and would competently testify with respect thereto.

2.      I am involved in and familiar with the Debtor's operations and the maintenance of its books and records. Certain of the facts set forth in this declaration are based upon the Debtor's business records. The documents and papers which comprise the business records of the Debtor are maintained by persons whose duty it is to keep such records accurately and correctly. The business records are created by employees of the Debtor by making a written record of each transaction or occurrence which relates to such events at or shortly after the time of such transaction or occurrence. I have reviewed certain of the Debtor's business records prior to making this declaration.

3.      I am informed and believe that SRG, formerly known as NBACO, Inc., was formed in or about May 1999 for the purpose of acquiring, owning, operating and franchising restaurants, and developing restaurant concepts.  I am also informed and believe that Anwar Soliman, the founder of SRG, owns all of the outstanding common stock of SRG.  He also served as an officer and a member of the Board of Directors, but has resigned all of his positions with SRG.  The Debtor filed a voluntary petition under chapter 11 of Title 11 of the United States Code on August 29, 2006 ("Petition Date") commencing the instant case.

4.      I am informed and believe that on August 6, 2003, SRG, along with Grandy's, Spoons, Spectrum, Crabby Bob's and Local Favorite filed voluntary chapter 11 petitions before the United States Bankruptcy Court, as Case Numbers: SA 03-15911 RA, SA 03-15916 RA, SA 03-15913 RA, SA 03-15915 RA, SA 03-15912 RA and SA 03-15914 RA.  I am also informed and believe that SRG owned all of the common stock of the five other debtors.

5.      I am informed and believe that: (a) Grandy's, Spoons, Spectrum and Local Favorite were acquired by SRG, in or about June 2000, from American Restaurant Group, Inc., of which Soliman was then CEO; (b) SRG incurred approximately $15 million in debt to Fleet and BET in order to complete the acquisition; (c) Crabby Bob's was acquired by SRG in or about October 2001, for $1.8 million in cash and $400,000 in notes; (d) All outstanding notes related to the Crabby Bob's acquisition were retired by January 31, 2002; (e) Under a plan of reorganization confirmed in August 2004, the various chapter 11 estates were substantively consolidated into the SRG estate; and (f) At the time of confirmation, BET had acquired the Fleet secured claim.

6.      The Debtor anticipates that at the time of the Sale, the Grandy's Business will consist of 72 Grandy's restaurants comprised of a single owned and operated prototype restaurant, a single owned and operated managed restaurant for sale, and 70 franchised restaurants.  Grandy's restaurants are family-owned, quick-service restaurants that serve moderately-priced, home-style "Southern" meals.  Most of the

Grandy's restaurants are located in Texas and Oklahoma, and the restaurants are typically located in free standing structures situated near shopping malls or other highly visible and trafficked locations.

7.    By Order entered November 2, 2006, the Debtor was authorized to retain XRoads Solutions Group, LLC ("XRoads") as its financial advisor to market and sell the Grandy's Business.

8.    The Initial Bidder is not related in any way to the Debtor or its management and the APA was negotiated at "arms length" and in good faith.

9.    The Debtor seeks to assume and assign to the Successful Bidder the unexpired real property leases ("Leases") and equipment leases and executory contracts ("Contracts") related to the Grandy's Business.  The Leases include real property leases pursuant to which the Debtor is the lessee and leases pursuant to which the Debtor is the sublessor.  The Leases and applicable cure amounts are described in Exhibit 2.  The Contracts include, *inter alia*, the Franchise Agreements, the Management Agreements (related to the Managed Stores), equipment leases and subleases, and food distributor and sub-distributor agreements.  The Contracts and applicable cure amounts are listed in Exhibit 3.

10.    There are certain personal property taxes purportedly owed by the Debtor related to the Grandy's Business ("Personal Property Taxes").  A schedule of the Personal Property Taxes asserted by the taxing authorities with respect to each location is attached as Exhibit 4.  The taxing authorities to whom Personal Property Taxes might be owed may assert liens against the personal property located at the Grandy's locations.  The Debtor does not admit and may dispute whether such liens exist at all.  In connection with the Sale of the Grandy's Business, the Debtor will set aside funds from the Sale proceeds sufficient to pay all allowed secured claims related to the Personal Property Taxes, with respect to each location actually sold, but in no event more than $92,287.40.

1    11.    I believe that the Sale of the Grandy's Business, pursuant to the Overbid

2    Procedures, to the Successful Bidder on terms at least as favorable to the Debtor and

3    the estate as those set forth in the APA is in the best interest of the estate and its

4    creditors and will result in the most value being realized by the Debtor and the estate for

5    the Grandy's Business.

6    12.    The Debtor leases 27 of the Grandy's locations pursuant to a Ground

7    Lease Agreement with CNL APF Partners, LP and USRP Funding 2001-A, LP

8    (collectively, "CNL"), subject to certain amendments (the "Master Lease")  A copy of the

9    Master Lease is attached as Exhibit 5.  The Master Lease was initially entered into

10   between the Debtor and U.S. Restaurant Properties Operating L.P. ("USRP").  CNL

11   subsequently succeeded to USRP's interests with respect to the Master Lease.  The

12   Debtor subleases locations covered by the Master Lease to its franchisees.

13   13.    Depending on the preferences of the Successful Bidder, the Debtor may

14   reject certain Leases under the Master Lease (the "Rejected Leases").  The Initial Bidder

15   has already designated certain Leases under the Master Lease for rejection (which list

16   may change depending on the preferences of the Successful Bidder).

17   14.    The Grandy's locations subject to the Master Lease can be, and are,

18   operated separately and independently of each other.

19   15.    CNL has allocated the pre-petition rent defaults between the individual

20   locations.  CNL provided the allocation schedule attached as Exhibit 6 to the Debtor.

21   I declare under penalty of perjury under the laws of the United States of America

22   that the foregoing is true and correct.

23   Executed this ⁵ᵗʰ day of January, 2007, at Irvine, California.

24

25   _____
                KENNETH MUCHA

26

27

28