1  Jeffrey N. Pomerantz (CA Bar No. 143717)
   Hamid R. Rafatjoo (CA Bar No. 181564)
2  PACHULSKI STANG ZIEHL YOUNG JONES
        & WEINTRAUB LLP
3  10100 Santa Monica Blvd., Suite 1100
   Los Angeles, California  90067-4100
4  Telephone: 310/277-6910
   Facsimile: 310/201-0760
5
   Attorneys for the Official Committee of Unsecured
6  Creditors

7          AND

8  WEILAND, GOLDEN, SMILEY, WANG EKVALL
        & STROK, LLP
9  Evan D. Smiley, State Bar No. 161812
   Philip E. Strok, State Bar No. 169296
10 Hutchison B. Meltzer, State Bar No. 217166
   650 Town Center Drive, Suite 950
11 Costa Mesa, California 92626
   Telephone:    (714) 966-1000
12 Facsimile:    (714) 966-1002

13 General Insolvency Counsel for Debtor in Possession

14          **UNITED STATES BANKRUPTCY COURT**

15          **CENTRAL DISTRICT OF CALIFORNIA**

16          **SANTA ANA DIVISION**

17 In re                                  Case No.: SA 06-11444-ES
                                          Chapter 11
18
   SPECTRUM RESTAURANT GROUP,             **FIRST AMENDED DISCLOSURE**
19 INC., a Delaware corporation[1],       **STATEMENT IN SUPPORT**
                                          **OF THE DEBTOR'S AND OFFICIAL**
20          Debtor.                       **COMMITTEE OF UNSECURED**
                                          **CREDITORS' FIRST AMENDED PLAN OF**
21                                        **REORGANIZATION (DATED MAY 10, 2007)**

22                                        **Disclosure Statement Hearing**
                                          Date:    May 31, 2007
23                                        Time:    10:30 a.m.
                                          Ctrm:    5A
24
                                          **Plan Confirmation Hearing**
25
                                          Date:    To Be Set
26                                        Time:    To Be Set
                                          Ctrm:    5A

27 [1] The Debtor and Debtor In Possession includes SPECTRUM RESTAURANT GROUP, INC., a Delaware corporation; GRANDY'S,
   INC., a California corporation; SPOONS RESTAURANTS, INC., a Texas corporation; SPECTRUM FOODS, INC., a California
28 corporation; CRABBY BOB'S FRANCHISE CORP., a California corporation; LOCAL FAVORITE, INC., a California corporation
   Substantively consolidated reorganized debtors under Case No. SA 03-15911-ES.

DOCS_LA:166829.3

PACHULSKI STANG ZIEHL YOUNG JONES & WEINTRAUB LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

PACHULSKI STANG ZIEHL YOUNG JONES & WEINTRAUB LLP
ATTORNEY AT LAW
LOS ANGELES, CALIFORNIA

**Table of Contents**

|  |  |  | Page |
|---|---|---|---|
| I. | INTRODUCTION | | 2 |
| | A. | Executive Summary of the Plan | 3 |
| | B. | Purpose of This Document | 4 |
| | C. | Deadlines for Voting and Objecting; Date of Plan Confirmation Hearing | 5 |
| | | 1. Time and Place of the Confirmation Hearing | 6 |
| | | 2. Deadline For Voting For or Against the Plan | 6 |
| | | 3. Deadline For Objecting to the Confirmation of the Plan | 6 |
| | | 4. Identity of Person to Contact for More Information Regarding the Plan | 7 |
| II. | DISCLAIMER | | 7 |
| III. | BACKGROUND | | 9 |
| | A. | Description and History of the Debtor's Business | 9 |
| | | 1. History of the Debtor | 9 |
| | | 2. Debtor's Business Operations | 10 |
| | B. | Principals/Affiliates of Debtor's Business | 12 |
| | C. | Management of the Debtor Before the Petition Date | 13 |
| | D. | Management of the Debtor After the Petition Date | 13 |
| | E. | Management of the Debtor After the Effective Date | 14 |
| | F. | Debtor's Current Financing Arrangements with BET | 14 |
| | G. | Events Leading to Filing of the Bankruptcy Case | 15 |
| | | 1. Debtor's Current Chapter 11 Proceeding | 15 |
| | H. | Significant Events in the Bankruptcy Case Through the Date of Filing of Disclosure Statement | 16 |
| | | 1. Plan and Disclosure Statement | 16 |
| | | 2. Cash Collateral | 17 |
| | | 3. 341(a) Meeting | 18 |
| | | 4. Appointment of an Official Committee of Unsecured Creditors | 18 |

DOCS_LA:166829.3

PACHULSKI STANG ZIEHL YOUNG JONES & WEINTRAUB LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

| | 5. | Order Regarding Provision of Adequate Assurances to Utility Providers | 18 |
| | 6. | Pre-Petition Wage Order | 19 |
| | 7. | Orders Authorizing Debtor to Finance Certain Insurance Premiums | 19 |
| | 8. | Order Limiting Notice | 19 |
| | 9. | Order Authorizing Debtor to Honor Certain Customer Obligations | 19 |
| | 10. | Key-Employee Retention Plan for Non-Insiders and Management Incentive Plan for Insiders | 19 |
| | 11. | Notices of Setting Insider Compensation | 21 |
| | 12. | Changes to the Composition of the Board of Directors | 21 |
| | 13. | Orders Authorizing an Extension of the Time for the Debtor to File Its Schedules and Statement of Financial Affairs | 22 |
| | 14. | Order Establishing Information-Access Protocol | 22 |
| | 15. | Order Authorizing Retention of Claims and Noticing Agent | 22 |
| | 16. | Order Authorizing Extension of Time to Assume or Reject Non-Residential Real Property Leases | 23 |
| | 17. | Motion for Authority to Assume Non-Residential Real Property Leases | 23 |
| | 18. | Stipulation Regarding Amendment to Ground Lease Agreement | 24 |
| | 19. | The Claims Bar Date | 25 |
| | 20. | Stipulation Resolving Certain Claims Under the Perishable Agricultural Commodities Act | 25 |
| | 21. | Motion for Relief from the Automatic Stay | 26 |
| I. | | Asset Disposition | 26 |
| | 1. | Sale of Grandy's Business | 26 |
| | 2. | Conversion of Grandy's Restaurant to Franchised Restaurant (Lubbock, TX) | 27 |
| | 3. | Assumption and Assignment of Lease (Fremont, California) | 28 |
| | 4. | National Sports Grill Conversion – Torrance, California | 28 |
| | 5. | National Sports Grill Conversion – Oceanside, California | 29 |
| | 6. | National Sports Grill Conversion – Santa Ana, California | 29 |
| | 7. | Tutto Mare, La Jolla Restaurant Sale | 29 |

8.   National Sports Grill Las Vegas Franchise.................................30

9.   Sale of Liquor Licenses .................................30

J.   Pending Litigation.................................30

1.   Pre-Petition Litigation.................................30

2.   City of Beverly Hills Litigation.................................30

3.   Workers' Compensation Related Claims and the BET Letters-of-Credit Claim.................................31

4.   BET Litigation .................................32

K.   Debtor's Franchising Activities .................................33

L.   Retention and Compensation of Professionals .................................34

1.   Retention of Professionals .................................34

2.   Compensation of Professionals .................................35

M.   Procedures Implemented to Resolve Financial Problems.................................35

1.   Increase Efficiency in Purchasing.................................36

2.   Store Operations.................................36

3.   Reduction in Overhead Expenses .................................37

IV.   ITEMIZATION OF DEBTOR'S ASSETS.................................38

A.   Cash on Hand.................................38

B.   Leased Real-Property Assets .................................38

C.   Owned Furniture, Fixtures, and Equipment.................................39

D.   Litigation Claims .................................39

1.   Actual and Projected Recovery of Preferential or Fraudulent Transfers...39

2.   Claims Against Anwar Soliman.................................40

3.   Complaint Seeking Injunction To Preserve Debtor's Net Operating Losses.................................40

4.   Claims Against Other Parties.................................41

V.   FINANCIAL INFORMATION  CONCERNING THE DEBTOR'S OPERATIONS .................................42

A.   Historical Financial Information.................................42

B.   Financial Information From the Petition Date Through March 31, 2007.................................43

-iii-

DOCS_LA:166829.3

C.    Debtor's Projected Financial Performance Under the Plan ....................................43

VI.    SUMMARY OF THE PLAN OF REORGANIZATION ..........................................44

A.    Treatment of Unclassified Claims ....................................................................44

B.    Treatment of Classified Claims .........................................................................45

C.    Executory Contracts and Unexpired Leases .....................................................47

D.    Plan Implementation ..........................................................................................48

E.    Corporate Structure ...........................................................................................48

F.    Management of the Reorganized Debtors ..........................................................48

G.    Issuance of Reorganized Spectrum Restaurant Group Common Stock .............49

H.    Litigation ............................................................................................................50

I.    Objections to Claims and Distributions ............................................................51

J.    Modification and Revocation of the Plan ..........................................................51

K.    Retention of Jurisdiction ...................................................................................52

VII.    RISK FACTORS ...........................................................................................................52

A.    Business Risks ...................................................................................................53

1.    Industry Conditions ...............................................................................53

2.    Competition ...........................................................................................53

3.    Seasonality ............................................................................................54

4.    Operating Cash Flow .............................................................................54

5.    Exit Financing .......................................................................................54

6.    Trade Credit ..........................................................................................54

7.    Ability to Achieve the Business Plan ....................................................55

8.    Availability of Sufficient Cash to Sustain Operations Prior to the Effective Date ........................................................................................55

9.    Ability to Convert Non-Core Restaurants into National Sports Grill Franchises or Consummate Sales to Non-Affiliated Third-Party Operators ..............................................................................................56

B.    Governmental Regulation and Litigation ..........................................................57

C.    Tax Risks ...........................................................................................................57

D.    Bankruptcy Risks ..............................................................................................58

PACHULSKI STANG ZIEHL YOUNG JONES & WEINTRAUB LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

PACHULSKI STANG ZIEHL YOUNG JONES & WEINTRAUB LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

1    1. Objection to Classifications ................................................. 58

2    2. Risk of Nonconfirmation of Plan ........................................ 58

3    3. Risk of Not Being Able to Confirm Plan Over BET's Objection ........... 59

4 **VIII. APPLICABILITY OF FEDERAL AND OTHER SECURITIES LAWS TO**
   **THE REORGANIZED SPECTRUM RESTAURANT GROUP COMMON**
5   **STOCK TO BE ISSUED UNDER THE PLAN ................................ 59**

6  A. Generally ................................................................ 59

7  B. Issuance of Securities Under the Plan ........................................ 60

8    1. Creditor Shares ........................................................ 60

9    2. Management Securities ................................................ 61

10  C. Transfer of Creditor Shares and Management Securities ................... 61

11    1. Creditor Shares ........................................................ 61

12    2. Management Securities ................................................ 64

13    3. Certain Transactions By Stockbrokers .............................. 65

14 **IX. SUMMARY OF TAX CONSEQUENCES ................................ 66**

15  A. Summary of Plan ........................................................ 67

16  B. Summary of Federal Income-tax Consequences to Debtor ............... 68

17    1. Tax Consequences to Debtor from Sale of Assets ................... 70

18    2. Cancellation of Indebtedness and Reduction of Tax Attributes. ...... 73

19    3. Limitation on Federal Tax Losses and Tax Attributes ............... 76

20    4. Alternative Minimum Tax .............................................. 80

21  C. Federal Income-tax Consequences to Holders of Claims and Interests ...... 81

22    1. Realization of Income or Loss by Claimants with Respect to
     Distribution of Cash, Property, Stock, or Restructured Debt in
23     Satisfaction of Claims ................................................ 82

24  D. Escrow Account Interest. .............................................. 83

25  E. Information Reporting and Backup Withholding .......................... 84

26 **X. CONDITIONS TO CONFIRMATION OF THE PLAN AND THE**
   **EFFECTIVE DATE OF THE PLAN ................................ 84**
27
  A. Conditions Precedent to Confirmation ................................ 84
28
  B. The Effective Date .................................................. 85

-v-

|  |  |  |  |
|---|---|---|---|
| | C. | Waiver of Conditions | 85 |
| | D. | Effect of Non-Occurrence of Conditions to Consummation | 86 |
| | E. | Confirmation Request | 86 |
| XI. | | CONFIRMATION REQUIREMENTS AND PROCEDURES | 86 |
| | A. | Who May Vote or Object | 87 |
| | | 1. Who May Object to Confirmation of the Plan | 87 |
| | | 2. Who May Vote to Accept/Reject the Plan | 87 |
| | | 3. Who is Not Entitled to Vote | 88 |
| | | 4. Who Can Vote in More Than One Class | 89 |
| | | 5. Votes Necessary to Confirm the Plan | 89 |
| | | 6. Votes Necessary for a Class to Accept the Plan | 89 |
| | | 7. Treatment of Nonaccepting Classes | 89 |
| | | 8. Request for Confirmation Despite Nonacceptance by Impaired Class(es) | 90 |
| | B. | Liquidation Analysis | 90 |
| | C. | Feasibility | 91 |
| XII. | | EFFECT OF CONFIRMATION | 93 |
| | A. | Binding Effect Of Confirmation | 93 |
| | B. | Revesting of the Property in the Reorganized Debtors | 93 |
| | C. | Good Faith | 93 |
| | D. | Authority to Implement Plan | 94 |
| | E. | Discharge and Injunction | 95 |
| | F. | Post-confirmation Conversion or Dismissal | 97 |

PACHULSKI STANG ZIEHL YOUNG JONES & WEINTRAUB LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

DOCS_LA:166829.3

# I.

## INTRODUCTION

Substantively consolidated entities, Spectrum Restaurant Group, Inc., a Delaware corporation; Grandy's, Inc., a California corporation; Spoons Restaurants, Inc., a Texas corporation; Spectrum Foods, Inc. a California corporation; Crabby Bob's Franchise Corp., a California corporation; and Local Favorite, Inc., a California corporation; (collectively, the "Debtor") is the debtor and debtor in possession in this chapter 11 bankruptcy case. The Debtor and the Official Committee of Creditors Holding General Unsecured Claims (the "Committee") submits this First Amended Disclosure Statement in Support of the Debtor's and Official Committee of Unsecured Creditors' First Amended Plan of Reorganization (Dated May 10, 2007) (the "Disclosure Statement"), in connection with the solicitation of acceptances and rejections with respect to the Debtor's and Official Committee of Unsecured Creditors' First Amended Plan of Reorganization (Dated May 10, 2007) (the "Plan"), a copy of which is submitted concurrently herewith. The Plan and Disclosure Statement contain a number of capitalized terms. The definitions for these capitalized terms (the "Definitions") are contained in **Article II** to the Plan.[2]

On August 29, 2006 (the "Petition Date"), the Debtor commenced this bankruptcy case by filing a voluntary bankruptcy petition under chapter 11 of title 11 of the United States Code, 11 U.S.C. § 101 et. seq., (the "Bankruptcy Code" or "Code").

Chapter 11 allows a debtor and, under some circumstances, creditors and others parties in interest, to propose a plan of reorganization. The plan may provide for the debtor to reorganize by continuing to operate, to liquidate by selling assets of the estate, or a combination of both. The Debtor and the Committee (the "Plan Proponents") are the parties proposing the Plan sent to you in

---

[2] Capitalized terms used and not otherwise defined herein shall have the same meanings as ascribed to them in the Plan and the Definitions set forth in **Article II** to the Plan.

PACHULSKI STANG ZIEHL YOUNG JONES & WEINTRAUB LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

DOCS_LA:166829.3

the same envelope as this document. THE DOCUMENT YOU ARE READING IS THE

DISCLOSURE STATEMENT FOR THE ENCLOSED PLAN.

      The Plan is a reorganization plan. In other words, the Plan Proponents seek to restructure the

Debtor's secured, priority, and unsecured debt and continue operating the Debtor's businesses as a

going concern. As discussed in detail below, the Plan Proponents believe that a reorganization – as

opposed to a liquidation – will maximize value for all creditor constituencies. The Plan Proponents

intend to fund payments required under the Plan from cash generated by (a) operations, (b) disposing

of certain of the Debtor's non-core assets, (c) converting certain owned restaurants to National

Sports Grill franchises, and (d) obtaining exit financing. Moreover, throughout the Case, the Debtor

has taken a variety of steps designed to increase profitability including beginning to implement

measures to increase sales, reducing expenses, disposing of excess real-property leases, and

eliminating under-performing restaurants, all of which will assist the Reorganized Debtors in

complying with their obligations under the Plan.

      The Effective Date of the proposed Plan is the later of: (a) the first (1st) day of the first

month that begins at least eleven (11) days following the Confirmation Date; or (b) the first day of

the first month after such date under clause (a) on which there is not in force any stay or injunction

against the enforcement of the Plan or the Confirmation Order, provided that the Effective Date will

not occur until all Conditions to the Effective Date set forth in the Plan have been satisfied. The

Plan Proponents expect that the Effective Date will be on or about July 1, 2007.

**A.**    **Executive Summary of the Plan**

      The Plan Proponents urge Holders of Claims and Interests to read the Plan and Disclosure

Statement in full to understand how the Plan affects their particular Claim or Interest. In summary,

the Plan converts all Allowed General Unsecured Claims against the Debtor to equity in

Reorganized Spectrum Restaurant Group. Allowed General Unsecured Claims shall receive 890,000

-3-

of the 1,000,000 shares to be issued (or reserved for issuance after the Effective Date) of the

Reorganized Spectrum Restaurant Group Common Stock. In addition, if the Debtor successfully

obtains Exit Financing, the BET Claims will be paid in full (subject to the resolution of the BET

Litigation). Alternatively, the Reorganized Debtors will make a substantial payment to BET on the

Effective Date and the remaining balance of the BET Secured Claims will be restructured and paid

over a period of time. Holders of Priority Non-Tax Claims will be paid in full as soon as practicable

after the Effective Date. Holders of Priority Tax Claims will be paid in full over a period of time

ending August 29, 2011, with such deferred payments including interest at the rate of 5% per annum.

All Interests in the Debtor will be cancelled, and the Holder of the Interests will receive 10,000

shares of Reorganized Spectrum Restaurant Group Common Stock. The Debtor will fund the Plan

from the proceeds of the Grandy's Sale, the proceeds of the Exit Financing, and the sale of other

non-core assets of the Estate.

After the Effective Date, the Reorganized Debtors will focus their efforts on operating the

Core Restaurants. In addition, the Reorganized Debtors will attempt to either convert their non-core

assets to National Sports Grill franchises, thereby growing the Reorganized Debtors' National Sports

Grill franchise operations or sell such assets to other third-party operators. If the Reorganized

Debtors are unable to consummate such conversions or sales within a reasonable period of time,

such restaurants will be closed.

The foregoing is merely an Executive Summary of the Plan and to the extent of any

inconsistencies between the Plan and this Executive Summary, the Plan shall control.

**B.**    **Purpose of This Document**

This Disclosure Statement summarizes what is in the Plan, and tells you certain information

relating to the Plan and the process the Court follows in determining whether or not to confirm the

Plan.

-4-

DOCS_LA:166829.3

**READ THIS DISCLOSURE STATEMENT CAREFULLY IF YOU WANT TO
KNOW ABOUT:**

      (1)     **WHO CAN VOTE OR OBJECT,**

      (2)     **WHAT THE TREATMENT OF YOUR CLAIM IS (i.e., what your claim will
receive if the Plan is confirmed), AND HOW THIS TREATMENT COMPARES TO WHAT
YOUR CLAIM WOULD RECEIVE IN LIQUIDATION,**

      (3)     **THE HISTORY OF THE DEBTOR AND SIGNIFICANT EVENTS DURING
THE BANKRUPTCY,**

      (4)     **WHAT THINGS THE COURT WILL LOOK AT TO DECIDE WHETHER
OR NOT TO CONFIRM THE PLAN,**

      (5)     **WHAT IS THE EFFECT OF CONFIRMATION, AND**

      (6)     **WHETHER THE PLAN IS FEASIBLE.**

This Disclosure Statement cannot tell you everything about your rights.  You should consider consulting your own lawyer to obtain more specific advice on how the Plan will affect you and what is the best course of action for you.

Be sure to read the Plan as well as the Disclosure Statement.  If there are any inconsistencies between the Plan and the Disclosure Statement, the Plan provisions will govern.

The Code requires a Disclosure Statement to contain "adequate information" concerning the Plan.  The Bankruptcy Court has approved this document as an adequate Disclosure Statement, containing enough information to enable parties affected by the Plan to make an informed judgment about the Plan.  Any party can now solicit votes for or against the Plan.

**C.**    **Deadlines for Voting and Objecting; Date of Plan Confirmation Hearing**

THE BANKRUPTCY COURT HAS NOT YET CONFIRMED THE PLAN DESCRIBED IN THIS DISCLOSURE STATEMENT.  IN OTHER WORDS, THE TERMS OF THE PLAN ARE

PACHULSKI STANG ZIEHL YOUNG JONES & WEINTRAUB LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

DOCS_LA:166829.3

NOT YET BINDING ON ANYONE.  HOWEVER, IF THE BANKRUPTCY COURT LATER

CONFIRMS THE PLAN, THEN THE PLAN WILL BE BINDING ON THE DEBTOR AND ON

ALL CREDITORS AND INTEREST HOLDERS IN THIS CASE.

### 1.      Time and Place of the Confirmation Hearing

The hearing where the Court will determine whether or not to confirm the Plan will take

place on _____, 2007, at _____ prevailing Pacific Time, before the Honorable Erithe A.

Smith, in Courtroom 5A, 411 West Fourth Street, Santa Ana, California.

### 2.      Deadline For Voting For or Against the Plan

If you are entitled to vote, it is in your best interest to timely vote on the enclosed ballot and

return the ballot in the enclosed envelope to Kurtzman Carson Consultants LLC, 12910 Culver Blvd.

Ste I, Los Angeles, CA 90066, Attention: Chris Schepper.

Your ballot must be received by 5:00 p.m. prevailing Pacific Time on _____, 2007 or it

will not be counted.

### 3.      Deadline For Objecting to the Confirmation of the Plan

Objections to the confirmation of the Plan must be filed with the Court and served by

_____, 2007 upon:  (a) counsel for the Committee, Jeffrey N. Pomerantz, Esq., Pachulski

Stang Ziehl Young Jones & Weintraub LLP, 10100 Santa Monica Boulevard, 11th Floor, Los

Angeles, California 90067; (b) counsel for the Debtor, Evan D. Smiley, Esq., Weiland, Golden,

Smiley, Wang, Ekvall & Strok, LLP, 650 Town Center Drive, Suite 950, Costa Mesa, California

92626; (c) counsel for BET, Penelope Parmes, Esq., Rutan & Tucker, 611 Anton Boulevard, Costa

Mesa, California 92626; and (d) Michael Hauser, Esq., Office of the United States Trustee, 411 West

Fourth Street, Suite 9041, Santa Ana, California 92701-8000.

DOCS_LA:166829.3

4.    **Identity of Person to Contact for More Information Regarding the Plan**

Any interested party desiring further information about the Plan should contact either (a)

counsel for the Debtor, Evan D. Smiley, Esq., Weiland, Golden, Smiley, Wang, Ekvall & Strok, LLP

at (714) 966-1000; or (b) counsel for the Committee, Jeffrey N. Pomerantz, Esq. at Pachulski Stang

Ziehl Young Jones & Weintraub LLP at (310) 277-6910.

## II.

## DISCLAIMER

THIS DISCLOSURE STATEMENT CONTAINS INFORMATION, THAT MAY BEAR

UPON YOUR DECISION TO ACCEPT OR REJECT THE PLAN.  PLEASE READ THIS

DOCUMENT WITH CARE.  THE PURPOSE OF THE DISCLOSURE STATEMENT IS TO

PROVIDE "ADEQUATE INFORMATION" OF A KIND, AND IN SUFFICIENT DETAIL, AS

FAR AS IS REASONABLY PRACTICABLE IN LIGHT OF THE NATURE AND HISTORY OF

THE DEBTOR AND THE CONDITION OF THE DEBTOR'S BOOKS AND RECORDS, THAT

WOULD ENABLE A HYPOTHETICAL REASONABLE INVESTOR TYPICAL OF HOLDERS

OF CLAIMS OR INTERESTS OF THE RELEVANT CLASS TO MAKE AN INFORMED

JUDGMENT CONCERNING THE PLAN.  SEE 11 U.S.C.§ 1125(a).

FOR THE CONVENIENCE OF CREDITORS, THIS DISCLOSURE STATEMENT

SUMMARIZES THE TERMS OF THE PLAN, BUT THE PLAN ITSELF QUALIFIES ANY

SUMMARY.  IF ANY INCONSISTENCY EXISTS BETWEEN THE PLAN AND THE

DISCLOSURE STATEMENT, THE TERMS OF THE PLAN ARE CONTROLLING.

NO REPRESENTATIONS CONCERNING THE DEBTOR, ITS FINANCIAL

CONDITION, OR ANY ASPECT OF THE PLAN ARE AUTHORIZED BY THE DEBTOR OR

THE COMMITTEE OTHER THAN AS SET FORTH IN THIS DISCLOSURE STATEMENT.

ANY REPRESENTATIONS OR INDUCEMENTS MADE TO SECURE YOUR ACCEPTANCE

PACHULSKI STANG ZIEHL YOUNG JONES & WEINTRAUB LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

-7-

DOCS_LA:166829.3

1   THAT ARE OTHER THAN AS CONTAINED IN OR INCLUDED WITH THIS DISCLOSURE

2   STATEMENT SHOULD NOT BE RELIED UPON BY YOU IN ARRIVING AT YOUR

3   DECISION.

4

5       THE FINANCIAL INFORMATION CONTAINED HEREIN IS UNAUDITED.  IN

6   ADDITION, BECAUSE OF THE DEBTOR'S FINANCIAL DIFFICULTIES, AS WELL AS THE

7   COMPLEXITY OF THE DEBTOR'S FINANCIAL MATTERS, THE BOOKS AND RECORDS

8   OF THE DEBTOR, UPON WHICH THIS DISCLOSURE STATEMENT IS BASED IN PART,

9   MAY BE INCOMPLETE OR INACCURATE. THE PLAN PROPONENTS ARE UNABLE TO

10   WARRANT OR REPRESENT THAT THE INFORMATION CONTAINED HEREIN IS

11   WITHOUT ANY INACCURACY. EFFORT HAS BEEN MADE TO ENSURE THAT ALL SUCH

12   INFORMATION IS FAIRLY PRESENTED.  WITH RESPECT TO THE FINANCIAL

13   PROJECTIONS, THESE SIMPLY REPRESENT THE PLAN PROPONENTS' BEST ESTIMATE

14   OF THE REORGANIZED DEBTORS' PERFORMANCE UNDER THE PLAN.  NONETHELESS,

15   THERE ARE UNCERTAINTIES ASSOCIATED WITH ANY PROJECTIONS, AND THEY

16   SHOULD NOT BE CONSIDERED WARRANTIES OR GUARANTIES OF THE

17   REORGANIZED DEBTOR'S PERFORMANCE HEREUNDER.  THESE RISKS ARE FURTHER

18   DESCRIBED IN SECTION VIII OF THIS DISCLOSURE STATEMENT.

19       WEILAND, GOLDEN, SMILEY, WANG EKVALL & STROK, LLP ("WGSWS")

20   COMMENCED REPRESENTING THE DEBTOR AND DEBTOR IN POSSESSION IN OR

21   ABOUT AUGUST 2006 AS INSOLVENCY COUNSEL. WGSWS HAS NOT AT ANY TIME IN

22   THE PAST, NOR DO THEY PRESENTLY, REPRESENT THE DEBTOR IN A GENERAL WAY,

23   OR IN ANY OTHER WAY, OTHER THAN AS SET FORTH ABOVE. PACHULSKI STANG

24   ZIEHL YOUNG JONES & WEINTRAUB LLP ("PSZYJW") COMMENCED REPRESENTING

25   THE COMMITTEE ON OR ABOUT SEPTEMBER 15, 2006 AS ITS GENERAL BANKRUPTCY

26   COUNSEL.  CORPORATE REVITALIZATION PARTNERS ("CRP") COMMENCED

27   REPRESENTING THE COMMITTEE AS ITS FINANCIAL ADVISORS ON OR ABOUT

28   SEPTEMBER 15, 2006. WGSWS, PSZYJW, AND CRP HAVE RELIED SOLELY UPON

*PACHULSKI STANG ZIEHL YOUNG JONES & WEINTRAUB LLP*
*ATTORNEYS AT LAW*
*LOS ANGELES, CALIFORNIA*

DOCS_LA:166829.3

PACHULSKI STANG ZIEHL YOUNG JONES & WEINTRAUB LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

1  INFORMATION PROVIDED BY THE DEBTOR IN CONNECTION WITH PREPARATION OF

2  THIS DISCLOSURE STATEMENT.  ALTHOUGH THE PROFESSIONALS HAVE

3  PERFORMED CERTAIN LIMITED DUE DILIGENCE IN CONNECTION WITH THE

4  PREPARATION OF THIS DISCLOSURE STATEMENT, THE PROFESSIONALS HAVE NOT

5  INDEPENDENTLY VERIFIED ALL OF THE INFORMATION CONTAINED HEREIN.

6      ALTHOUGH A COPY OF THE DISCLOSURE STATEMENT HAS BEEN SERVED ON

7  THE SECURITIES AND EXCHANGE COMMISSION ("SEC") AND THE SEC HAS BEEN

8  GIVEN AN OPPORTUNITY TO OBJECT TO THE ADEQUACY OF THE DISCLOSURE

9  STATEMENT, THIS DISCLOSURE STATEMENT HAS NOT BEEN REGISTERED UNDER

10  THE SECURITIES ACT OF 1933, AS AMENDED (THE "SECURITIES ACT") OR

11  APPLICABLE STATE SECURITIES LAWS.  NEITHER THE SECURITIES AND EXCHANGE

12  COMMISSION NOR ANY STATE REGULATORY AUTHORITY HAS PASSED UPON THE

13  ACCURACY OR ADEQUACY OF THIS DISCLOSURE STATEMENT, THE EXHIBITS

14  HERETO, OR THE STATEMENTS CONTAINED HEREIN.

15      THE CONTENTS OF THIS DISCLOSURE STATEMENT SHOULD NOT BE

16  CONSTRUED AS LEGAL, BUSINESS, OR TAX ADVICE.  EACH CREDITOR OR INTEREST

17  HOLDER SHOULD CONSULT HIS OR HER OWN LEGAL COUNSEL AND ACCOUNTANT

18  AS TO LEGAL, TAX, AND OTHER MATTERS CONCERNING HIS OR HER CLAIM.

19                              **III.**

20                          **BACKGROUND**

21

22  **A.**    **Description and History of the Debtor's Business**

23          **1.    History of the Debtor**

24      Spectrum Restaurant Group, Inc., ("SRG") formerly known as NBACO, Inc., was formed in

25  or about May 1999 for the purpose of acquiring, owning, operating, and franchising restaurants, and

26  developing restaurant concepts.  Anwar Soliman, the founder of Debtor, currently owns all of the

27  outstanding common stock of SRG.  Mr. Soliman also served as an officer and SRG's Chief

28

-9-

1    Executive Officer and the Chairman of its Board of Directors, but resigned all of his positions just

2    after the Petition Date.

3

4         SRG is a holding company and owns all of the common stock of Grandy's, Inc., a California

5    corporation; Spoons Restaurants, Inc., a Texas corporation; Spectrum Foods, Inc. a California

6    corporation; SRG Franchise Corp. f/k/a Crabby Bob's Franchise Corp., a California corporation; and

7    Local Favorite, Inc., a California corporation. Grandy's, Spoons, Spectrum, and Local Favorite were

8    acquired by SRG in or about June 2000 from American Restaurant Group, Inc., of which Soliman

9    was then CEO. SRG incurred approximately $15 million in debt to Bank of Boston/Fleet and BET

10   in order to complete the acquisition. Crabby Bob's was acquired by Debtor in or about October

11   2001 for $1.8 million in cash and $400,000 in notes. All outstanding notes related to the Crabby

12   Bob's acquisition were retired by January 31, 2002.

13       **2.    Debtor's Business Operations**

14        As of the Petition Date, the Debtor's restaurant operations were as follows:

15       **a.    Grandy's**

16        The Grandy's Business , which consisted of 72 Grandy's restaurants comprised of a single

17   owned and operated prototype restaurant, a single owned and operated managed restaurant for sale,

18   and 70 franchised restaurants. Grandy's restaurants are family-oriented, quick-service restaurants

19   that serve moderately priced, home-style "Southern" meals. Most of the Grandy's restaurants were

20   located in Texas and Oklahoma, and the restaurants were typically located in freestanding structures

21   situated near shopping malls or other highly visible and trafficked locations.

22       **b.    Spoons**

23        As of the Petition Date, the Debtor owned and operated five (5) casual-style, full-service

24   Spoons restaurants in California. These restaurants are located in Sunnyvale, Campbell, Riverside,

25   Oceanside, and Santa Ana. The restaurants offer a full-service menu encompassing fare such as

26   hamburgers, sandwiches, tacos, and an array of "Tex-Mex" appetizers. Spoons restaurants are

27   designed to offer customers a fresh, value-oriented alternative to traditional quick-service

28   restaurants. Spoons restaurants are generally housed in leased space in freestanding structures in

-10-

PACHULSKI STANG ZIEHL YOUNG JONES & WEINTRAUB LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

PACHULSKI STANG ZIEHL YOUNG JONES & WEINTRAUB LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

1   heavily traveled areas.

2           The Debtor continues to market its interests in these restaurants to third parties who will

3   either continue to operate the restaurants as Spoons restaurants (with a license from the Debtor) or

4   convert those restaurants to National Sports Grills.  As part of any conversion transactions, subject to

5   compliance with the California Franchise Investment Law, the Debtor and the purchasers would

6   enter into franchise agreements pursuant to which each restaurant will be operated as a National

7   Sports Grill franchise.

8                   c.      **Crabby Bob's**

9           As of the Petition Date, the Debtor owned and operated two (2) Crabby Bob's restaurants in

10  San Bernardino and Ontario, California that offer a full-service menu of fresh seafood.  Crabby

11  Bob's restaurants are typically located in leased space in freestanding buildings located in heavily

12  traveled areas.  During the Case the Debtor closed the Crabby Bob's restaurant in Ontario because of

13  poor financial performance at that location.

14                  d.      **Specialty Restaurants**

15          As of the Petition Date, the Debtor owned and operated nine (9) upscale specialty restaurants

16  in California. The following chart contains the name, location, and cuisine of each fine-dining

17  restaurant.  Each of the restaurants is located in leased space in heavily traveled areas.

18

| Name | Location | Cuisine |
|---|---|---|
| Prego Ristorante | Irvine | Italian |
| Prego Ristorante | Beverly Hills | Italian |
| Prego Ristorante | San Diego | Italian |
| Guaymas | Tiburon | Mexican |
| Tutto Mare | La Jolla | Italian |
| Tutto Mare | Newport Beach | Italian |
| Harrys Bar and American Grill | La Jolla | American/Italian |
| MacArthur Park | San Francisco | American |
| MacArthur Park | Palo Alto | American |

24

25          During the Case, the Debtor's lease for its Tutto Mare restaurant in Newport Beach was not

26  renewed and the restaurant closed on or about January 5, 2007.  In addition, on or about May 7,

27  2007, the Debtor closed its MacArthur Park, San Francisco restaurant.  The Debtor is in the process

28  of vacating the restaurant and the lease will be rejected effective May 15, 2007.  In addition, the

-11-

1   Debtor is in the process of liquidating its personal property at the restaurant that will not be

2   transferred to other locations.

3       Throughout the Case, the Debtor has marketed for sale its assets relating to several of the

4   above restaurants.  In connection therewith, the Debtor has retained real estate brokers to assist in the

5   marketing effort.  As a result of such efforts, and as discussed below, the Debtor has sought Court

6   approval of the sale of the Tutto Mare, La Jolla location.  The Debtor is also in negotiation for either

7   the sale of its Prego, San Diego location to a third party or the surrender of the property to the

8   landlord.  The Debtor is optimistic that the Tutto Mare, La Jolla and Prego, San Diego transactions

9   will close prior to the Effective Date.

10          e.      **National Sports Grill**

11      The Debtor operates two (2) National Sports Grill sports-themed restaurants in Anaheim and

12  Buena Park, California. The Debtor also is the current franchisor for one National Sports Grill

13  restaurant in Cerritos, California (with the Torrance, California conversion underway).  The

14  restaurants offer a casual-dining experience in an environment where the patrons can view multiple

15  video telecasts of national and regional sports events.  The Debtor is in discussions regarding an

16  agreement relating to the development of a National Sports Grill franchise in Las Vegas, Nevada.

17  The Debtor is also in discussions regarding the conversion of some of the Debtor's Spoon's

18  restaurants into National Sports Grill franchises.  Any franchise agreements to be executed by the

19  Debtor or the Reorganized Debtors shall be in compliance with the California Franchise Investment

20  Law.

21

22  **B.      Principals/Affiliates of Debtor's Business**

23      Anwar Soliman owns 100% of the outstanding stock of the Debtors and is an Insider as that

24  term is defined in Section 101(31) of the Bankruptcy Code.

PACHULSKI STANG ZIEHL YOUNG JONES & WEINTRAUB LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

-12-

**C.      Management of the Debtor Before the Petition Date**

After confirmation of the Prior Plan, the Debtor's Board of Directors (the "Board") consisted

of the following persons: (1) Anwar Soliman; (2) Larry Cano; (3) Jack Whitehurst; and (4) Ken

Mucha.  In addition, under the terms of the Prior Plan, Numair Pirzada was appointed as the

representative of the unsecured creditors' committee (the "Committee Representative") and became

the fifth member of the Board.  Mr. Mucha resigned from the Board just prior to the Petition Date.

The Board voted unanimously to commence the Case by filing a voluntary chapter 11 bankruptcy

petition.   In addition, soon after the Petition Date, as a result of an alleged uncured default under the

terms of the Prior Plan, the Committee Representative exercised his rights to appoint two additional

members to the Board.    Mr. Pirzada appointed Frederick Croft and Gregg Martins to the Board.  At

or around the same time, Messrs. Soliman, Cano, and Whitehurst resigned from the Board.

Accordingly, just after the Petition Date, the Board consisted of Messrs. Pirzada, Croft, and Martins

**D.      Management of the Debtor After the Petition Date**

Soon after the Petition Date, the Debtor retained Anthony Wolf of Glass & Associates as its

Chief Executive Officer.  Mr. Wolf served as Chief Executive Officer until October 19, 2006.

Thereafter, Mr. Croft was appointed the Debtor's Chief Executive Officer.  Pursuant to that certain

Stipulation Re: Notices Of Setting Insider Compensation For Fred Croft, Numair Pirzada, And Greg

Martins approved by the Court on or about December 7, 2006 (the "Management Stipulation"), Mr.

Croft resigned as Chief Executive Officer and a member of the Board.  In addition, Mr. Martins

resigned as a member of the Board.  Pursuant to the terms of the Management Stipulation, Mr.

Mucha was appointed Interim Chief Executive Officer.  In addition, the Committee and BET were

each permitted to appoint one member to the Board.  The Committee appointed Tim O'Shea to the

Board.  BET has not yet designated any member of the Board.  In March 2007, Mr. Pirzada resigned

-13-

1    from the Board. Accordingly, as of the filing of the Plan, Mr. O'Shea is the sole member of the

2    Board and Mr. Mucha is the Interim Chief Executive Officer.

3        In connection with the restructuring of the Board, the Debtor entered into Letter Agreements

4    with Messrs. O'Shea and Pirzada that set forth the terms of their compensation for participating as a

5    member of the Board. The Letter Agreements provided for (a) annual compensation of $25,000; (b)

6    an additional $1,000 per Board meeting with a maximum of two paid Board meetings per month; (c)

7    reimbursement of reasonable business expenses; and (d) with respect to Mr. O'Shea, his entitlement

8    to certain options to purchase Reorganized Spectrum Restaurant Group Common Stock pursuant to

9    the Non-Employee Director Stock Option Plan. As discussed above, in March 2007, Mr. Pirzada

10    resigned as a member of the Board.

11

12

13    **E.**    **Management of the Debtor After the Effective Date**

14        After the Effective Date, the Board of Directors will consist of Messrs. O'Shea, Mucha, and

15    a third person to be identified by the Plan Proponents ten (10) days prior to the Confirmation

16    Hearing Date. On the Effective Date, Mr. Mucha will be appointed Chief Executive Officer.

17

18    **F.**    **Debtor's Current Financing Arrangements with BET**

19        BET is the Debtor's principal secured creditor. BET asserts liens encumbering substantially

20    all Assets of the Estate. As discussed below, the Committee has challenged BET's liens with respect

21    to certain items of collateral and has commenced the BET Litigation seeking declaratory relief as to

22    the validity, nature, and priority of certain of BET's liens and avoidance of BET's unperfected

23    security interests.

24

25        The Debtor's obligations to BET consist of the BET Loan Claims and the BET Letters of

26    Credit Claims. The BET Loan Claims are Claims of BET relating to (a) a Purchase Agreement (the

27    "Purchase Agreement") and Credit Agreement (the "Credit Agreement") pursuant to which the

28

-14-

PACHULSKI STANG ZIEHL YOUNG JONES & WEINTRAUB LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

Debtor executed Notes in or around June 2000 (the "Original Notes"); (b) a Second Amended and Restated Senior Secured Subordinated Note dated September 30, 2004 in the original principal amount of $7,294,270 (a "Second Amended Note"); (c) Amendment No. 3 to the Purchase Agreement dated September 30, 2004 ("Amendment No. 3"); and (d) Amendment No. 4 to the Credit Agreement dated September 30, 2004 ("Amendment No. 4"). The balance due with respect to the BET Loan Claims as of April 30, 2007 is approximately $5,845,000. The BET Letters of Credit Claims are Claims of BET relating to certain letters of credit in the aggregate original amount of $1,639,000 that were outstanding as of the date of the filing of the Plan and Disclosure Statement. The BET Letters of Credit expire on August 1, 2007, subject to renewal in accordance with their terms.

As discussed below, the Court has entered a series of cash collateral orders pursuant to which (a) the Debtor has obtained use of sufficient cash to sustain operations during the pendency of the Case; (b) BET has received certain adequate protection payments; and (c) BET has received a partial pay down of the principal amount of its Claim.

**G.    Events Leading to Filing of the Bankruptcy Case**

**1.    Debtor's Current Chapter 11 Proceeding**

The Debtor made all payments due under the Prior Plan to BET. However, BET declared a default in July 2006, after BET asserted that its collateral base was deteriorating in value based upon the alleged failure of the Debtor to turn over certain proceeds from the sale of certain restaurants. The Debtor disputed some of the alleged defaults. The Debtor used these proceeds to fund its operations. On or about August 28, 2006 BET filed a Complaint for: (1) Conversion; (2) Breach of Contract; (3) Declaratory Relief; (4) Injunctive Relief; (5) Constructive Trust; (6) Accounting; (7) Recovery of Personal Property; and (8) Foreclosure of Security Interest in Personal Property against the Debtor pursuant to which BET sought to exercise and enforce its rights as a secured creditor for

-15-

PACHULSKI STANG ZIEHL YOUNG JONES & WEINTRAUB LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

1   Debtor's alleged defaults.  In addition, BET filed an emergency motion to convert the Prior Cases to

2   cases under Chapter 7 of the Bankruptcy Code, which motion was scheduled for hearing on August

3   29, 2006 at 9:30 a.m.

4
        In addition, the Committee Representative, appointed under the Prior Plan, had previously
5
    declared a default alleging that the Debtor had failed to set aside funds required under the Prior Plan
6
    in a separate reserve.  As discussed above, the Committee Representative exercised his rights under
7
    the Prior Plan to replace two members of the Board with nominees of the Committee Representative.
8
9   Lastly, the Debtor was delinquent with respect to many of its real-property leases and faced

10  enforcement actions by various landlords threatening to terminate the Debtor's leases.  As a result of

11  the pending BET motion to convert, the Committee Representative declared default.  The resultant

12  liquidity crisis put the Debtor's valuable leases in jeopardy of being terminated.  Accordingly, the

13
    Board unanimously decided to file a voluntary chapter 11 bankruptcy petition, thereby commencing
14
    the Case.
15

16
17  **H.    Significant Events in the Bankruptcy Case Through the Date of Filing of Disclosure
            Statement**
18

19          **1.    Plan and Disclosure Statement**
20
            On January 24, 2007, the Court entered its Order Authorizing First Extension of Exclusivity
21
    Periods Pursuant to 11 U.S.C. Section 1121(d) (the "Exclusivity Order").  The Exclusivity Order
22
23  extended the time period in which the Debtor has the exclusive right to file a plan of reorganization

24  through and including January 31, 2007 and the time period in which the Debtors had the exclusive

25  right to solicit votes thereon to April 1, 2007.

26          On January 31, 2007 the Debtor and the Committee filed (a) the Debtor's and Official
27
    Committee of Unsecured Creditors' Plan of Reorganization (Dated January 31, 2007); and (b) the
28

PACHULSKI STANG ZIEHL YOUNG JONES & WEINTRAUB LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

1   Disclosure Statement in Support of the Debtor's and Official Committee of Unsecured Creditors'

2   Plan of Reorganization (Dated January 31, 2007).

3       On February 12, 2007, the Debtor and the Committee filed the Debtor's And Creditors'

4   Committee's Motion For The Entry Of An Order (1) Approving Solicitation, Voting, Balloting And

5

6   Notice Procedures And (2) Setting Confirmation Hearing And Certain Deadlines In Connection

7   With The Debtor's And Committee's Plan Of Reorganization (Dated January 31, 2007) (the

8   "Solicitation Motion").

9       On April 24, 2007, the Court entered its Order Authorizing Extension of Exclusivity Period

10  Pursuant to 11 U.S.C. Section 1121(d), pursuant to which the Court granted the Debtor an extension

11

12  until August 1, 2007 to solicit acceptances in connection with the Plan.

13      **2.    Cash Collateral**

14      On or about September 1, 2006, the Court entered its Order Granting Debtor's Emergency

15  Motion pursuant to which the Debtor was authorized to use BET's cash collateral for an interim

16  period pending a final hearing.  On October 20, 2006, the Court entered its Stipulation and Order

17  Thereon Authorizing Use of Cash Collateral Pursuant to 11 U.S.C. Section 363 and Grant of

18  Adequate Protection Pursuant to 11 U.S.C. Sections 361 and 363 (the "Cash Collateral Order").  The

19  Cash Collateral Order authorized the Debtor to use BET's cash collateral on a consensual basis

20  through the week ending January 27, 2007, which was later extended to February 6, 2007 through a

21

22  further stipulation.

23      On January 8, 2007, the Debtor filed its Motion For Order Authorizing Use Of Cash

24  Collateral Of Secured Claimant (the "Second Cash Collateral Motion") pursuant to which the Debtor

25  sought authority to use BET's cash collateral through the earlier of the Effective Date or May 4,

26  2007.  The Court granted the Second Cash Collateral Motion at a hearing held on February 6, 2007.

27

28

-17-

PACHULSKI STANG ZIEHL YOUNG JONES & WEINTRAUB LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

1    On March 23, 2007, the Debtor filed its Motion to Approve Third Stipulation for Use of Cash

2    Collateral (the "Third Cash Collateral Motion"), which approved a stipulation with BET authorizing

3    the Debtor's use of cash collateral through and including the week ending June 1, 2007. In addition,

4    the Third Cash Collateral Motion included a partial settlement between the Debtor, the Committee,

5    and BET pursuant to which (a) BET received a $1,500,000 principal paydown of the BET Secured

6    Claim and reimbursement of certain post petition draws on the BET Letters of Credit; (b) BET

7    authorized use of its cash collateral to fund monies required to cure defaults under certain non-

8    residential real property leases that the Debtor sought to assume; and (c) released $750,000 in cash

9    to the Debtor's Estate to fund unpaid Administrative Claims. The Court approved the Third Cash

10   Collateral Motion at a hearing held on April 10, 2007.

11   **3.    341(a) Meeting**

12   The first called meeting of creditors pursuant to section 341(a) of the Bankruptcy Code was

13   held on November 1, 2006.

14   **4.    Appointment of an Official Committee of Unsecured Creditors**

15   The Office of the United States' Trustee appointed the Committee on or about September 15,

16   2006. The Committee consists of the following creditors: Upperview Developments Inc.; U.S.

17   Bancorp Equipment Finance, Inc.; CNL APF Partners LP; Anderson Seafoods, Inc.; BiRite

18   Foodservice Distributors Inc.; American Restaurant Group, Inc.; and U.S. Foodservice, Inc.

19   **5.    Order Regarding Provision of Adequate Assurances to Utility Providers**

20   On September 27, 2006, the Court entered its Order Under Section 366 of the Bankruptcy

21   Code (1) Prohibiting Utility Providers from Altering, Refusing, or Discontinuing Service, (2)

22   Deeming Utilities Adequately Assured of Payment, and (3) Establishing Procedures for Determining

23   Adequate Assurance of Payment pursuant to which the Court established certain criteria for

24   providing sufficient protection to utility providers for the payment of utility bills (the "Utilities

25   Order"). The Debtor also entered into four separate stipulations with utility providers that modified

26   the terms of the Utilities Order with respect to those utilities.

*PACHULSKI STANG ZIEHL YOUNG JONES & WEINTRAUB LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA*

-18-

PACHULSKI STANG ZIEHL YOUNG JONES & WEINTRAUB LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

6.    **Pre-Petition Wage Order**

On September 1, 2006, the Court entered its Order Granting Debtor's Emergency Motion for Order Authorizing (1) Payment of Pre-Petition Wages and Employee Expense Reimbursement Claims; and (2) Honoring of Pre-Petition Employee Benefits (the "Employee Wage Order"). Pursuant to the Employee Wage Order, the Court authorized the Debtor to honor certain pre-petition wage obligations and honor other employment policies in the ordinary course of business.

7.    **Orders Authorizing Debtor to Finance Certain Insurance Premiums**

The Court has entered two orders authorizing the Debtor to finance certain insurance premiums. The first order, entered on September 27, 2006, authorized the Debtor to finance premiums relating to the following types of insurance: general liability, workers' compensation, business auto, property, kidnap and ransom, umbrella/excess liability, and notary errors and omissions. The second order, entered on October 20, 2006, authorized the Debtor to finance insurance premiums relating to directors and officers liability insurance.

8.    **Order Limiting Notice**

On September 13, 2006, the Court entered its order limiting the scope of notice that needed to be provided with respect to certain motions and applications.

9.    **Order Authorizing Debtor to Honor Certain Customer Obligations**

On September 1, 2006, the Court entered its Order Authorizing Debtor to Honor and Comply with Customer Obligations and Deposits (the "Customer Order"). Pursuant to the Customer Order, the Court authorized the Debtor to honor certain pre-petition obligations to customers and to apply certain customer deposits to events held Post-petition.

10.    **Key-Employee Retention Plan for Non-Insiders and Management Incentive Plan for Insiders**

On or about December 12, 2006, the Court entered its Order Approving Debtor's Motion For An Order Approving (1) Compensation And Incentive Bonus Plan For Certain Insider Employees, and (2) Retention Bonus Plan for Certain Non-Insider Employees (the "Incentive Plan Order"). Pursuant to the Incentive Plan Order, the Court authorized the Debtor to adopt a plan to motivate certain non-Insiders who were employed in connection with the Grandy's Business to remain in the

-19-

Debtor's employ pending consummation of a sale of the Grandy's Business. In addition, the Debtor obtained authority to provide incentive compensation to Messrs. Mucha, Whitehurst, and Yee based upon meeting certain threshold events relating to maximizing the value of other assets of the Estate. Mr. Whitehurst was retained by the purchaser of the Grandy's Business and is no longer employed by the Debtor. Mr. Yee is no longer employed by the Debtor.

Based upon Mr. Mucha's vital and substantial contributions to the restaurant sale process and in order to further incentives Mr. Mucha, in April 2007 the Board of Directors approved an additional bonus plan for Mr. Mucha, subject to Court approval in connection with Confirmation of the Plan (the "Further Bonus Plan"). The Further Bonus Plan, which is supported by the Committee, provides as follows (the "Mucha Incentive Plan"):

(a)    In addition to Mr. Mucha's base salary, Mr. Mucha will be paid 2% of the gross sale price generated by any transaction (e.g., sale, franchise agreement, buyout of lease, etc.) that closes after April 19, 2007 (whether pre or post-confirmation) and which is negotiated while Mr. Mucha is employed by the Debtor. However, 0.5% of the gross sale price will be withheld and only paid if: (1) Mr. Mucha continues his employment with the Debtor through the sale of the last of the Debtor's restaurants; (2) Mr. Mucha is terminated by the Board of Directors without cause; or (3) the Board of Directors consents to the payment in writing.

(b)    In the event that Mr. Mucha is terminated by the Board without cause, including but not limited to a termination by the Board because of a sale of assets of the Reorganized Debtors or a downsizing of the Reorganized Debtors' operations, Mr. Mucha shall be entitled to six (6) months' severance pay, conditioned upon Mr. Mucha executing a mutual general release in favor of the Reorganized Debtors and their agents.

-20-

(c)    The success fee ($50,000) payable to Mr. Mucha pursuant to the Prior Bonus

Order, shall be paid on the earlier of (1) confirmation of a plan, (2) a sale of substantially all of the

assets of the Estate, or (3) termination of Mr. Mucha, without cause, by the Board.

The terms of the Mucha Incentive Plan are incorporated into the Plan and will be

effective on the Effective Date (with compensation paid on the Effective Date retroactive to April

19, 2007).

**11.    Notices of Setting Insider Compensation**

On or about November 15, 2006, the Debtor served its Notices of Setting Insider

Compensation for Numair Pirzada, Fred Croft, and Greg Martins (the "Insider Compensation

Notices"). Pursuant to the Insider Compensation Notices, the Debtor sought to retain Mr. Croft as

the Debtor's Chief Executive Officer and also compensate all Board members for their participation

in all Board meetings. The Committee and BET objected to the Insider Compensation Notices. The

Debtor, the Committee, and BET agreed to resolve the objections to the Insider Compensation

Notices pursuant to the terms of that certain Stipulation Re: Notices Of Setting Insider

Compensation For Fred Croft, Numair Pirzada, And Gregg Martins (the "Management Stipulation").

In February 2007, the Debtor served its Notices of Setting Insider Compensation for Numair

Pirzada and Tim O'Shea (the "Second Insider Compensation Notices"). Pursuant to the Second

Insider Compensation Notices, the Debtor sought to compensate Messrs. O'Shea and Pirzada

pursuant to the terms of Letter Agreements entered into with the Debtor which are described in

Article III.D above.   Based upon objections to the Second Insider Compensation Notice as it related

to Mr. Pirzada, the Debtor and Mr. Pirzada negotiated an agreement pursuant to which Mr. Pirzada

resigned as a member of the Debtor's Board of Directors.

**12.    Changes to the Composition of the Board of Directors**

DOCS_LA:166829.3

1   Pursuant to the terms of the Management Stipulation, the Committee nominated Tim O'Shea

2   as its selection for the Board. From 1996 through the present, Mr. O'Shea has been employed with

3   Fresh Choice Restaurants, LLC where he has held the positions of Vice President of Marketing,

4   Executive Vice President of Marketing, Chief Operating Officer, and, since 2004, Chief Executive

5   Officer. As discussed above, Mr. Numair Pirzada has resigned from the Board of Directors. BET

6   has not yet designated its appointee to the Board.

7

8   **13.    Orders Authorizing an Extension of the Time for the Debtor to File Its Schedules and Statement of Financial Affairs**

9   On September 13, 2006, the Court entered the Order Granting Motion to Extend Time to File

10  Schedules and Statements (the "Schedules and Statements") extending the time for the Debtor to file

11  the Schedules and Statements until October 4, 2006. On October 4, 2006, the Debtor filed the

12  Schedules and Statements with the Court. On or about November 21, 2006, and December 4, 2006,

13  the Debtor filed certain amendments to the Schedules and Statements. A copy of the Schedules and

14  Statements are available from the Web site established by Kurtzman, Carson Consultants, LLC, the

15  Debtor's claims and noticing agent at www.kccllc.net/spectrum.

16

17  **14.    Order Establishing Information-Access Protocol**

18  On October 31, 2006, the Court entered its Order On The Motion Of The Official Committee

19  Of Unsecured Creditors For Order Approving Information Access Protocol Under Section

20  1102(B)(3) Of The Bankruptcy Code (the "Information Access Protocol Order"). Pursuant to the

21  Information Access Protocol Order, the Court authorized procedures to govern the Committee's

22  obligations to provide access to information to its constituents to comply with the provisions of

23  Section 1102(B)(3) of the Code.

24

25  **15.    Order Authorizing Retention of Claims and Noticing Agent**

26  On November 27, 2006, the Court entered its Order Approving Amended Application of

27  Debtor and Debtor in Possession For Approval of Employment of Notice, Balloting and Claims

28

PACHULSKI STANG ZIEHL YOUNG JONES & WEINTRAUB LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

-22-

Agent (Kurtzman Carson Consultants, LLC) (the "Claims Agent Order"). Pursuant to the Claims Agent Order, Kurtzman Carson Consultants, LLC ("KCC") has been maintaining the docket of all Claims filed in this Case as well as serving as the noticing agent. As discussed above, KCC is also maintaining a Web site for the Case that contains up-to-date information pertinent to the Case. KCC also assisted the Debtor in preparing the Schedules and the Office of the United States Trustee 7-Day Package.

### 16.    Order Authorizing Extension of Time to Assume or Reject Non-Residential Real Property Leases

On or about December 21, 2006, the Court granted the Motion of Debtor and Debtor In Possession for Order Extending the Time Under 11 U.S.C. Section 365(d)(4) To Assume or Reject Unexpired Leases of Non-Residential Real Property (the "Lease Extension Motion"). Pursuant to the Lease Extension Motion, the Court extended until March 27, 2007 the deadline by which the Debtor is required to assume or reject its non-residential real property leases under Section 365 of the Bankruptcy Code.

### 17.    Motion for Authority to Assume Non-Residential Real Property Leases.

On February 27, 2007, the Debtor filed its Motion for Order: (1) Authorizing and Approving Assumption of Certain Unexpired Non-Residential Real Property Leases; and (2) Extending Date by Which Certain Non-Residential Real Property Leases Must be Assumed or Rejected (the "First Lease Assumption Motion"). Pursuant to the First Lease Assumption Motion, the Debtor sought to assume its non-residential real-property leases with respect to the following restaurants: (1) Spoons- Cerritos, (2) Spoons- Sunnyvale, (3) Spoons- Riverside, (4) Prego- Beverly Hills, (5) Guaymas, (6) National Sports Grill- Buena Park, and (7) National Sports Grill- Anaheim. In addition, by agreement with certain other landlords, the Debtor sought to extend further the time to move to assume or reject its non-residential real-property leases until May 15, 2007 with respect to the following restaurants: (a) Corporate Office- Irvine, (b) Spoons- Santa Ana, (c) MacArthur Park- San

-23-

PACHULSKI STANG ZIEHL YOUNG JONES & WEINTRAUB LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

On January 16, 2007, the Court entered its Order approving the Stipulation Regarding Amendment to Ground Lease Agreement pursuant to which the Debtor and USRP Funding 2001-A, LP; and CNL APF Partners, LP agreed to a rejection of four of the properties included in the parties' ground lease under certain terms and conditions.

### 19.    The Claims Bar Date

The Court set January 31, 2007 as the general bar date for filing proofs of claim in this Case. No bar date has been set for the filing of Administrative Claims, except that the Claims Bar Date applies to any Administrative Claims that are asserted under Section 503(b)(9) of the Bankruptcy Code for goods received by the Debtor within twenty (20) days of the Petition Date.    The deadline for filing proof of claim by governmental entities is February 26, 2007.    Only three (3) creditors filed Claims asserting Administrative Claims under Section 503(b)(9).    Accordingly, other than those three (3) Claims, any remaining Section 503(b)(9) Claims have been extinguished.

### 20.    Stipulation Resolving Certain Claims Under the Perishable Agricultural Commodities Act

The Perishable Agricultural Commodities Act ("PACA") provides that the proceeds of the sale of certain agricultural claims by food dealers are to be held in trust for the benefit of the seller of such goods.    Two parties asserted PACA Claims against the Estate.    On or about December 30, 2006, the Debtor entered into that certain Stipulation Regarding Allowance Of PACA Trust Fund Claims And Turnover Of Proceeds (the "PACA Stipulation").    Pursuant to the PACA Stipulation, the Debtor agreed to pay Daylight Produce Company and F.T. Produce $63,149.63 and $65,016.61, respectively, in full satisfaction of all PACA Claims asserted by those parties.    As part of the PACA Stipulation and in consideration of the waiver of interest and attorney fees, the Debtor released both parties from claims to avoid pre-petition transfers to such parties under the provisions of the Bankruptcy Code.    The Court entered its Order approving the PACA Stipulation on or about January 26, 2007.

-25-

PACHULSKI STANG ZIEHL YOUNG JONES & WEINTRAUB LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

21.    **Motion for Relief from the Automatic Stay**

On or about January 30, 2007, CIT Group/Equipment Financing, Inc. ("CIT") filed its

Motion for Relief from the Automatic Stay (the "CIT Stay Motion"). The CIT Stay Motion

concerns certain lease agreements between CIT and the Debtor with respect to the lease of restaurant

equipment. The Debtor and CIT have reached a resolution of the CIT Stay Motion pursuant to

which the Debtor will pay CIT in exchange for (a) CIT's transfer to the Debtor of all the personal

property included in the various lease agreements with the Debtor; and (b) CIT's waiver of any

Claims against the Debtor relating to the leases, including, but not limited to Administrative Claims.

I.    **Asset Disposition**

Since the Petition Date, the Debtor, working together with the Committee and BET, have

evaluated the profitability of the Debtor's operations. As a result of such analysis, the Debtor, the

Committee, and BET all agreed that it was in the best interests for creditor constituencies to dispose

of certain of the Debtor's non-Core assets. In addition, the Debtor has continued to implement its

strategy, where appropriate, to locate parties interested in converting certain of the Debtor's

underperforming assets to National Sports Grill franchised restaurants. Lastly, the Debtor has

retained a broker to attempt to sell its restaurants in San Diego, California. The Debtor's efforts to

dispose of its non-Core assets are described in the following paragraphs.

1.    **Sale of Grandy's Business**

By Order entered November 2, 2006, the Debtor was authorized to retain XRoads Solutions

Group, LLC ("XRoads") as its financial advisor to market and sell the Grandy's Business. XRoads

marketed the Grandy's Business on a national basis to in excess of 220 potentially interested parties.

Marketing of the Grandy's Business included preparation of a two-page investment summary (the

"Teaser") and a comprehensive confidential information memorandum containing substantial

financial and qualitative information concerning the Grandy's Business (the "CIM"). XRoads began

contacting potentially interested parties as well as receiving direct inquiries from third parties in

-26-

PACHULSKI STANG ZIEHL YOUNG JONES & WEINTRAUB LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

1    October 2006. XRoads sent a Non-Disclosure Agreement ("NDA") and the Teaser to 141 parties.

2    Of those 141 parties, 32 executed NDAs and were sent the CIM and provided access to an online

3    dataroom established by XRoads that contained substantial due diligence information.  As a result of

4    the process the Debtor received several offers.  Ultimately the Debtor, in consultation with the

5    Committee and BET, selected Jon Bangash as the stalking-horse buyer and negotiated an Asset

6    Purchase Agreement providing for the sale of the Grandy's Business for approximately $6,450,000,

7    subject to adjustment.

8

9       On January 16, 2007 the Court approved the Debtor's Motion For Order Authorizing And

10    Approving:  (1) Sale Of Certain Of Debtor's Assets ("Grandy's") Free And Clear Of Liens, Claims,

11    And Interests Pursuant To 11 U.S.C. §§ 363(B) And (F); And (2) Assumption And Assignment Of

12    Related Unexpired Leases And Executory Contracts (the "Grandy's Sale Procedures Order").

13

14       Pursuant to the Grandy's Sale Procedures Order, the Debtor conducted an auction on

15    February 5, 2007.  As a result of the auction, Souper Salad's bid of $6,775,000 was determined to be

16    the highest and best offer for the Grandy's Business.  The Court approved the sale at a hearing held

17    on February 6, 2007 and entered its Order Approving Sale Of All Or Substantially All All Assets

18    Related To The Grandy's Business Free And Clear Of All Liens, Claims, Encumbrances, And

19    Interests And (B) Assumption And Assignment Of Certain Executory Contracts And Unexpired

20    Leases Incidental Thereto on February 6, 2007.  The sale closed on February 20, 2007.

21

22      **2.**     **Conversion of Grandy's Restaurant to Franchised Restaurant (Lubbock, TX)**

23       On October 17, 2006, the Court entered its Order Granting Motion for Order (1) Authorizing

24    and Approving the Sale of Certain Assets of the Estate Free and Clear of Liens, Claims and Interests;

25    (2) Authorizing and Approving the Assumption of Unexpired Lease; and (3) Authorizing the Debtor

26    to Enter Into and Approving Franchise Agreement and Sublease (the "Lubbock Sale Order").

27

28    Pursuant to the Lubbock Sale Order, the Debtor sought authority to sell its company-owned

DOCS_LA:166829.3

1  Grandy's store in Lubbock, Texas to an existing franchisee. That transaction closed and the Debtor

2  received sale proceeds of $7,000 and a $63,000 promissory note amortized over six (6) years with a

3  balloon payment within 3 years.

4          **3.      Assumption and Assignment of Lease (Fremont, California)**

5          On October 20 2006 the Court entered its Order Granting Debtor-in-Possession's Motion for

6  Order (1) Authorizing and Approving the Sale of Certain Assets of the Estate Free and Clear of

7  Liens, Claims, and Interests and (2) Authorizing and Approving the Assumption and Assignment of

8  Unexpired Lease (the "Fremont Sale Order"). Pursuant to the Fremont Sale Order, the Debtor

9  sought to assume and assign its non-residential real property lease in Fremont, California to Fremont

10  Wings, a Hooters franchisee. That transaction closed on or about January 9, 2007. The Debtor

11  received approximately $310,000 in net proceeds in connection with the transaction.

12          **4.      National Sports Grill Conversion – Torrance, California**

13          On October 17, 2006, the Court entered its Order Granting Motion for Order (1) Authorizing

14  and Approving Sale of Certain Assets of the Estate Free and Clear of Liens, Claims, and Interests;

15  (2) Authorizing and Approving the Assumption of Unexpired Lease; and (3) Authorizing the Debtor

16  to Enter into and Approving Franchise Agreement and Sublease (the "Torrance Sale Order").

17  Pursuant to the Torrance Sale Order, the Debtor consummated a transaction that had been agreed to

18  and partially consummated prior to the Petition Date. Pursuant to the transaction, the Debtor

19  subleased its Torrance, California restaurant to a party who intends to convert the restaurant to a

20  National Sports Grill franchise subject to compliance with the California Franchise Investment Law.

21  The Debtor received $850,000 in connection with this transaction, of which $125,000 was received

22  after the Petition Date.

-28-

PACHULSKI STANG ZIEHL YOUNG JONES & WEINTRAUB LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

PACHULSKI STANG ZIEHL, YOUNG JONES & WEINTRAUB LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

5.    **National Sports Grill Conversion – Oceanside, California**

On March 30, 2007, the Debtor filed its Motion for Order Authorizing and Approving: (1) Sale of Certain Assets of the Estate Free and Clear of Liens, Claims and Interests; (2) Trademark License; (3) Assumption and Assignment of Unexpired Lease; and (4) Employment and Payment of Real Estate Broker (ERA New Star Realty and Investment) (the "Oceanside Motion").  Pursuant to the Oceanside Motion, the Debtor sought authority to sell assets relating to its Spoons Oceanside restaurant to a purchaser who intended to continue operating the restaurants as a Spoons restaurant. After the purchaser funded the escrow, the purchaser decided not to proceed with the transaction and forfeited its $50,000 deposit.

The Debtor believes it has reached an agreement regarding the sale of its Spoons Oceanside restaurant for $650,000 to a third party who will continue to operate the restaurant as a Spoons Restaurant subject to a license agreement with the Debtor.

6.    **National Sports Grill Conversion – Santa Ana, California**

On May 4, 2007, the Debtor filed its Motion for Sale of Property Under Section 363(b) and Assumption and Assignment of Lease (the "Santa Ana Sale Motion").  Pursuant to the Santa Ana Sale Motion, the Debtor seeks authority to assume and assign its lease with respect to its Spoons, Santa Ana location to a third party who intends to convert the restaurant to a National Sports Grill franchise subject to compliance with the California Franchise Investment Law.  The Debtor expects to generate approximately $500,000 from the transaction.  The Court has scheduled a hearing on the Santa Ana Sale Motion for May 29, 2007.

7.    **Tutto Mare, La Jolla Restaurant Sale**

On May 4, 2007, the Debtor filed its Motion to Sell Property Free and Clear of Liens, Assume and Assign Unexpired Lease; and Pay Real Estate Broker (Tutto Mare La Jolla) (the "Tutto Mare Sale Motion").  Pursuant to the Tutto Mare Sale Motion, the Debtor requests authority to sell

-29-

the assets relating to its Tutto Mare, La Jolla restaurant to a third party and expects to generate gross

sale proceeds of approximately $330,000 before payment of lease cures and related closing costs.

The Court has scheduled a hearing to consider the Tutto Mare Sale Motion for May 29, 2007.

### 8.    National Sports Grill Las Vegas Franchise

The Debtor is in discussions with a potential franchisee for the purchase and creation for a

new National Sports Grill franchise in Las Vegas, Nevada. The Debtor expects to receive

approximately $75,000 from the transaction as a franchisee fee plus future royalties under the

franchise agreement, which will be executed in connection with the transaction.

### 9.    Sale of Liquor Licenses

On April 24, 2007, the Court entered its Order Authorizing and Approving the Sale of Liquor

Licenses Pursuant to 11 U.S.C. Section 363(b) (the "Liquor License Order"). Pursuant to the Liquor

License Order, the Court authorized the Debtor to sell the liquor licenses used in connection with the

Debtor's former Tutto Mare Newport Beach, and Crabby Bob's Ontario restaurants for $22,000 and

$40,000, respectively.

### J.    Pending Litigation

#### 1.    Pre-Petition Litigation

The Debtors were parties to a number of lawsuits pending at the time of the Petition Date

(the "Litigation"). Attached as **Exhibit "A"** is a list of such Litigation and a description of the status

of each lawsuit. The lawsuits cover a variety of issues including mechanic's lien litigation to various

tort claims including sex and race discrimination and wrongful death. These lawsuits arose prior to

the Petition Date and, to the extent they constitute Allowed Claims, will be classified as Class 4(a) or

(b) Claims.

#### 2.    City of Beverly Hills Litigation

In November 2006, the Debtor received a citation from the Beverly Hills Police Department

alleging illegal gambling at the Prego Beverly Hills location. The Debtor was unaware of such

-30-

PACHULSKI STANG ZIEHL YOUNG JONES & WEINTRAUB LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA